## Case No. 14,510.

### UNITED STATES v BALTIMORE & O. R. CO.

#### [1 Hughes, 138.] [1]

District Court, D. West Virginia. Nov., 1875.

GRANTS—RAILROAD CONCESSION—RIGHT OF WAY OVER GOVERNMENT LANDS — CONTRACT — LICENSE—REVOCATION—EQUITABLE ESTOPPEL.

1. Under the act of March 3, 1819 [3 Stat. 520], authorizing the secretary of war to sell "such military sites belonging to the United States as may have been found or become useless for military purposes," and the act of 28th

<hr>

1 [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

April, 1828 [4 Stat. 264], authorizing the president to "sell forts, arsenals, dockyards, lighthouses, or any property held by the United States for like purposes," the secretary of war had authority to execute the agreement it made with the Baltimore & Ohio Railroad Company on the 5th November, 1838, conceding to the company "authority to construct their railroad along and over their property" at Harper's Ferry, Virginia.

2. The grant by congress to the president, of a right to dispose of the full title in fee in real property, implies the grant of all minor powers, and these powers may be exercised by the secretary of war as agent of the president.

3. Where, under a contract perpetual in its purport, a license to use property for specific purposes is not specially restricted, and is coupled with an interest which was necessary to the possession and enjoyment of the rights acquired under the permission, the license is not revocable as long as the interest exists; and though the fee simple remains in the grantor, the right to use is paramount to the fee, and the doctrine of equitable estoppel applies against the grantor.

[Cited in brief in Hillsdale College v. Rideout, 82 Mich. 95, 46 N. W. 373.]

In equity.

JACKSON, District Judge. The bill filed in this cause seeks, first, to cancel an agreement in writing, entered into November 5, 1838, between Joel R. Poinsett, then secretary of war of the United States, and Louis McLane, then president of the Baltimore & Ohio Railroad Company, under which agreement the railroad company claims title to so much of a tract of land known as the "Harper's Ferry Property," as is used and occupied for the purposes of its road; secondly, to remove a cloud upon the title of the government to the property, growing out of a claim of title derived from one Patrick Byrne to that portion of it occupied by the defendant. It is conceded that the United States derived title to the Harper's Ferry tract through sundry conveyances made in 1796, and afterwards, "to George Washington, president of the United States, and his successors in office;" that by virtue of the conveyances so made, the government of the United States became seized and possessed of this tract of land, and continued to hold possession of it (except that portion occupied by the railroad company) from 1796 until the 30th of November, 1869, when it was sold by the government to Francis C. Adams. That shortly after the government acquired the property, she established upon it a national armory, which was used for the manufacture of arms and munitions of war until the armory was destroyed, in the year 1861. This being the condition of the property in the year 1838, the railroad company applied, through its president, Louis McLane, to the government of the United States for permission to occupy a portion of the tract for a right of way across it for railroad purposes, which resulted in the agreement of November 5, 1838, between Joel R. Poinsett, then secretary of war, on behalf of the government of the United States, and Louis McLane, on behalf of the railroad company.

By the terms of that agreement, "authority was conceded by the government to the railroad company to construct their railroad along and over the property of the United States." It is claimed by the defendant, the railroad company, that under and by virtue of this agreement, it has an easement in the property occupied by it so long as it is used for railroad purposes. But if it should be mistaken in this position, the company claims title to the land in controversy under a deed from Patrick Byrne, who claimed it under a grant from the state of Maryland, whose jurisdiction extended to the south bank of the Potomac river.

With reference to the second position of the defendant, which I propose to consider first, it is alleged that the railroad tracks, and, in fact, all the ground used for railroad purposes, is a "fill," built by the company in the river, and upon what is claimed to be its bed at the date of the agreement between the government and the railroad company, within the territory of Maryland, and, consequently, covered by the Byrne title. However this fact may be, it is not deemed to be a matter of importance in this case, as the defendant first took possession of the property in controversy, claiming it under the agreement of November 5, 1838; and so far as the question of possession arises between the United States and the defendant, it is a matter of no moment whether the United States had a good title, or whether the secretary of war had authority to execute the agreement. By the express terms of the agreement, the defendant was to build a sustaining wall parallel to the then existing wall built by the government, between it and the river in some places, and within the river at others, for the purpose of making the "fill" upon which the railroad track was to be built. Thus it appears that the defendant, under an express provision in this agreement, was to build a wall and make the necessary fill, deriving its authority for so doing from the government alone. If stronger evidence was required to establish the intention and understanding of the parties at the time the agreement was entered into, none could be brought. At that time no one questioned the right of the government to the property, and being a riparian owner, she was entitled to any accretions, whether the result of the action of the water, or the result of labor and skill applied and used to confine the river to what appeared to be its natural channel, so far as it would not interrupt the flow of water or obstruct navigation. The government had a clear right to authorize, as she did, the erection of the wall, not only for the purposes of a railroad bed, but to furnish a bank for the river, so as to prevent its encroaching further upon the main land. This view of the case explains clearly the conduct of the parties at the time, and tends to establish the fact, that the river at the date of the agreement had by its wash encroached on the main land, some distance beyond its original limits. But that fact did not alter the boundary line between the states, and hence both parties must have regarded the property as within the jurisdiction of Virginia when the agreement was made; otherwise, it would not have been entered into with its existing terms and conditions.

But suppose at the time the agreement was entered into, the title of Patrick Byrne covered the land in controversy. Would that fact alter the legal relations between the parties in this case? I think not. The defendant did not acquire the title of Byrne until September, 1841, long after the agreement made with the United States under which they took possession of the disputed property. When the deed of Byrne was executed, it passed nothing, because he was out of possession of the property intended to be conveyed, and the possession of it was had under a claim of title adverse to him. If, however, it had passed any title, the defendant took it in subordination to the title of the government. At the time of the execution of this deed, the defendant was a tenant under the United States, and was bound by every obligation, both legal and moral, to protect the title of its landlord until it should restore the possession of the property to it. True, it might disclaim the tenancy by actual notice, or by such notorious acts as would be equivalent to such notice. It is not, however, pretended that any such disclaimer was ever made in the case. On the contrary, the defendant, in its answer, claims right to the possession and use of the property under the agreement made with the secretary of war, November 5, 1838. Holding this relation to the United States, it cannot shelter itself behind the Byrne or any outstanding title, but must stand or fall with the title it acquired from the United States.

This brings me to consider the first ground of defence set up by the defendant in answer to the bill of the complainants, to wit, the validity of its title under the United States. It is not questioned, and in fact it cannot be denied, that if the claim of the United States covered the land in controversy, her title is good. That being conceded, the next question that presents itself for consideration is, has the defendant an inchoate or perfect title from the United States? The consideration of this question involves the authority of the secretary of war to make the agreement he did of November 5, 1838, which the complainants in this action very gravely question, and insist that the action of the secretary of war is without color of authority, and absolutely void or voidable. Congress, by an act passed and approved by the president at an early date, established a national armory upon this property at Harper's Ferry, by which it became dedicated to military purposes. From the time of its dedication to the date of the agreement be-

tween the secretary of war and the railroad company, it was alone used as a site for military purposes. During that period, arms and munitions of war were there manufactured under the direction of the war department. This property, as well as all military property belonging to the United States, is and always has been under the general management of the secretary of war. With the knowledge of this fact, congress, by an act passed March 3, 1819, invested the secretary of war with authority to make sale of "such military sites belonging to the United States as may have been found or become useless for military purposes." As far back as the 6th day of May, 1836, construction was given to this act by Mr. B. F. Butler, then attorney general of the United States, in which opinion he held that the secretary of war was authorized to make sale of any "military sites" belonging to the government at the date of the act, which were no longer needed for military purposes. 3 Op. Atty. Gen. p. 108. The government seems to have adopted this construction, and its correctness does not appear to have been since questioned. In the case of U. S. v. Chicago, 7 How. [48 U. S.] 188, the supreme court of the United States refer to this act, and concede the power of the secretary of war to sell what was then known as Fort Dearborn, or any portion of that property, under it. It will be seen that the power claimed for the secretary of war under this act is sustained not only by precedent in the department, but by judicial authority.

But it is claimed that the act applies only to military sites, such as public forts and dockyards, and not to a property used for the purpose of manufacturing arms and munitions of war. It must be borne in mind, however, that congress, in establishing the public armory at Harper's Ferry, fixed its location and dedicated it to military purposes. That it was a military site, used for military purposes, seems to me not to admit of a doubt. But precedent is not wanting for this position. The view of the question is sustained by Mr. Crittenden, when attorney general of the United States, in discussing the power of the secretary of war under this statute, in regard to the property now in question. 5 Op. Atty. Gen. p. 550. Under this opinion of the attorney general, the secretary of war laid out a large portion of the public property at Harper's Ferry, not needed for military purposes, into town lots, streets and alleys, and the lots were sold to parties who took possession under the title thus derived from the government, and they are so held to this day. So far as it now appears, no question has been raised as to the power he exercised upon that occasion. The government having in all its branches acquiesced in this action of the war department, she should not be permitted to change her position with reference to this property, but her rights should be determined according to the construction heretofore given the act, which seems to me not only to be warranted by its terms, but does no violence to the language employed to express its object.

I have thus far examined the act of 1819, and the powers of the secretary of war under it. The defendant, however, does not rely alone upon it for its defence, but seeks to protect itself under the act of 1828. This act authorizes the president to "sell forts, arsenals, dockyards, lighthouses, or any property held by the United States for like purposes," when no longer needed for the purposes for which they were used. Under this statute the power to sell is expressly conferred upon the president. It is claimed, however, that this agreement was the act of the secretary of war, and not of the president, and therefore not within the words of the statute, and, as a consequence, is not binding on the United States. It is now well settled, that "the president speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties." This property belonged, as I have before said, to the war department, and was under the immediate control of the secretary of war. He was, in the making of this agreement, but the agent of the president, and I feel justified in presuming that it was done under his direction, and with his assent, and is therefore, in contemplation of law, the act of the president. Wilcox v. Jackson, 13 Pet. [38 U. S.] 498.

I, therefore, conclude that by both the acts of 1819 and 1828, the secretary of war was authorized to sell any property belonging to his department not longer needed by the government. It is suggested, however, that although the power be conceded, he did not exercise the right conferred by the statute, but instead of selling the property, he "granted permission to the railroad company to run their road through the lands belonging to the United States." It is sufficient to say in reply to this position, that the secretary of war is by law invested with the power to look after and take care of all public property belonging to his department, and so to use and manage it as will be best for the public interests. Whilst he could not sell, or by any act of his part with the legal title to any property belonging to the United States, except under authority derived from congress, yet, as incident to the power of his office, and in the exercise of a discretion with which all heads of departments are vested, he would have the right to lease property not longer needed for public purposes, not only for the preservation of it, but, if practicable, to render it productive of revenue to the government, until it could be disposed of in pursuance of law. Being invested with authority to dispose of it by grant in fee, all minor powers over the property are necessarily implied.

This conclusion brings me to notice briefly the rights acquired by the defendant under this agreement. Under the permission grant-

ed in this agreement, the railroad company entered upon and took possession of the disputed property, and constructed their line of railway across it. The license granted was for an indefinite period, no time being fixed when the permission to use the lands for the purpose specified in the agreement was to terminate. Up to this time it has never been revoked, nor has any notice been given by the government of its intention or even its desire to revoke it, until the institution of this suit. The defendant accepted this license upon the terms indicated. It built and constructed its railroad under this authority. It was the extension of a great national highway, and as we now know, second to none in magnitude and importance in this or any other country. It must have been apparent to both the contracting parties that an enterprise at that time so stupendous in its character as the construction of a railroad from Baltimore to the Ohio river, was to be permanent and lasting. A right thus acquired, under a written license not specially restricted, is commensurate with the thing of which the license is an accessory. That it was so understood by the secretary of war is shown by the fact that he expressly provided in his agreement with the defendant that "the said company shall allow the United States to construct and keep up forever a depot, with suitable tracks, switches, and turnabouts, to be connected with said road." Here there is a reservation of a right forever upon the part of the agent of the government, clearly indicating that he understood that the defendant was to use and enjoy the license thus granted as long as it should see proper to do so. The inference is clear to my mind that it was the intention of the secretary of war to dedicate the property granted under this license to this specific use, which was a public one. It was for a great national highway. Having so donated and declared the purposes and object of the donation, it became dedicated to the specific purposes indicated. By this act upon the part of the United States, through their agent, the defendant, as well as the public through it, has acquired an easement in the property, so long as it continues to use it for the purposes granted, which is said "to be a liberty, privilege, or advantage which one may have in the lands of another without profit." The owner of the fee, whoever he may be, cannot revoke the license granted. The fee will remain in the original owner, or his grantees, but the right of the defendant to the use is paramount to the title of the owner of the fee, and does not require the fee for its protection. Trustees of M. E. Church v. Mayor, etc., of Hoboken, 33 N. J. Law, 13; Wilson v. Sexon, 27 Iowa, 15.

And here the doctrine of equitable estoppel may be justly applied. Under the permission given, the defendant built its railroad over the land of the complainants, with their knowledge and assent, which depends for its value on remaining in its present position. Acting in good faith, it was influenced to make large expenditures both of time and money in its construction. The plaintiffs were influenced in granting the license by the benefits to be derived from the construction of the road in furnishing them with better facilities of transportation at reduced rates. It was simply the advantage of a railroad for transportation over the old wagon-roads, which, in the light of subsequent events, proved to be of incalculable benefit to the property. The benefits thus derived, whilst they may not amount to a valuable consideration, were the inducements that operated upon the complainants to grant the license. It was a power coupled with an interest, which was both necessary to the possession and enjoyment of the rights acquired under the permission, and is not revocable as long as the interest exists. Were it otherwise, a revocation of the power would follow, and the defendant would be constrained to remove its railroad at a great loss. Such a result would work gross injustice to the defendant, and would allow the complainants to take advantage of their own wrong. It is here that equity interposes her power to estop the complainant from disturbing the defendant in the rights acquired by it under the agreement, otherwise it would have no remedy. It is now the settled doctrine that "equity will execute every agreement, for the breach of which damages may be recovered, when an action for damages would be an inadequate remedy." In this case no adequate compensation could be made the defendant for the damages it would sustain by the revocation of its license and the loss of rights acquired under it. The complainant having without objection permitted the defendant to construct over their lands a public railroad, "cannot, after the road is completed, or large expenditures have been made thereon, upon the faith of their apparent acquiescence, reclaim the land or enjoin its use by the railroad company." Goodin v. Cincinnati & W. Canal Co., 18 Ohio St. 169; Cumberland Val. R. Co. v. McLanahan, 59 Pa. St. 24, 31. And this doctrine is reaffirmed in 21 Ohio St. 553, in which case the learned court declare that "it is the dictate of natural justice that he who, having a right or interest, by his conduct influences another to act on the faith of its non-existence, or that it will not be asserted, shall not be allowed afterwards to maintain it to his prejudice." Out of this just principle has grown the equitable doctrine of estoppel in pais, so well stated and strongly approved by Fonblanque in his treatise on Equity (volume 1, c. 3, § 4); by Chancellor Kent in Wendell v. Van Rensselaer, 1 Johns. Ch. 344; by Lord Macclesfield in the leading case of Savage v. Foster, 9 Mod. 35.

In the case under consideration, no one can question the fact that the defendant was influenced in the course it pursued by the conduct of the government through its of-

ficer, the secretary of war. The company entered upon the premises under its agreement with the government, and remained in the peaceable possession and the quiet enjoyment of them for a period of upwards of thirty years. During all this time not the slightest intimation was ever given to it of any claim whatever upon the part of the government to the disputed premises. I therefore conclude that, upon every principle, both legal and equitable, the complainants cannot and ought not to be permitted at this late day to disturb the defendant in the possession of the premises under the agreement of 1838. Nor do I think a right of compensation exists in this case. No actual consideration is expressed in the agreement, and the omission to do so implies that both parties understood that none was demanded. It is manifest that the secretary of war required no consideration, for the reason that he looked to the additional facilities of transportation the construction of the railroad would furnish, as well as to the enhanced value of the residue of the property consequent upon its construction. It seems to me, therefore, that every consideration of justice between the parties requires me to treat and hold the license in this case as an executed contract giving an absolute right. I am therefore of the opinion that, upon any view of the case presented by the pleadings, the bill should be dismissed for the reasons assigned.