CENTRAL TRUST CO. OF NEW YORK and another *v.* WABASH, ST. L. & P. RY. CO. and others. (CITY OF ST. LOUIS and another, Intervenors.)[1]

*(Circuit Court, E. D. Missouri.* December 13, 1886.)

1. CONTRACT—CONSTRUCTION—PUNCTUATION.
   Where the meaning of a contract is doubtful, the punctuation may be taken into consideration, in deciding upon the proper construction.
2. SAME—CONTEXT.
   A single sentence of a contract should not be construed as if standing alone, but with reference to the context.
3. SAME—PUBLIC POLICY—RAILROAD COMPANIES.
   Railroads perform a *quasi* public service, and, so far as vested property interests are not impaired, such construction should be given to all contracts made by them as will make them most fully subserve the interests and welfare of the general public.
4. SAME—CONSIDERATION—COMPROMISE.
   The law favors compromises, and upholds them as considerations of the covenants of the compromising parties.[2]
5. SAME—PERFORMANCE—MUTUALITY.
   A party who has been paid for a privilege cannot resist its enforcement on the mere ground that he cannot compel the other party to continue in its enjoyment.
6. EQUITY—PRACTICE—JURISDICTION—DECREE.
   Where a court of equity takes jurisdiction of a controversy, it is bound to continue that jurisdiction up to the final determination of the entire controversy.
7. SPECIFIC PERFORMANCE — EQUITY — JURISDICTION — RAILROAD COMPANIES—RIGHT OF WAY.
   Where a railroad company binds itself by contract to allow other companies to use its right of way under such reasonable regulations and terms as may be agreed upon by such companies, and thereafter refuses to recognize the right

---

[1] Edited by Benj. F. Rex, Esq., of the St. Louis bar.

[2] The law favors the settlement of disputed matters without recourse to litigation, Hart v. Gould, (Mich.) 28 N. W. Rep. 831; Wells v. Neff, (Or.) 12 Pac. Rep. 84. Such settlement of claims asserted in good faith, the validity of which has been doubted, constitutes a valid compromise which will not be disturbed in the absence of fraud, undue advantage, or mistake, Shipman v. District of Columbia, 7 Sup. Ct. Rep. 134; Stimpson v. Poole, (Mass.) 6 N. E. Rep. 705; Adams v. Adams, (Iowa,) 30 N. W. Rep. 795; Zimmer v. Becker, (Wis.) 29 N. W. Rep. 228, and note; and which furnishes a sufficient consideration for the mutual promises of the parties, Lipsmeier v. Vehslage, *ante*, 175, and note; Dunham v. Griswold, (N. Y.) 3 N. E. Rep. 76; Adams v. Adams, (Iowa,) 30 N. W. Rep. 795.

of another company to use such right of way upon any terms, a court of equity has power to enforce the contract, determine the amount of consideration, and decide upon the regulations.

8. SAME—CONTRACTS INDEFINITE AS TO DETAILS.

Where a right is absolutely contracted for, but the details are left unsettled, either because they cannot be determined at the time the contract is made, or because the changing condition of affairs indicates that details' must be subject to modification, and should therefore be left to settlement by agreement or decree at the time the right may be insisted upon, a court of equity will not hold the contract incomplete, when called upon to enforce it, if the details are of a nature which it can properly fix and settle, but will determine the right, and prescribe and settle the details. The decree should be subject to modifications, however.

9. RAILROAD COMPANIES—LEASE—RIGHT OF WAY—COMPENSATION FOR USE.

The defendant company having contracted to allow another company to use its right of way and track upon reasonable terms, *held,* that such latter company desiring to use such right of way and track jointly with the owner should, under the circumstances of this case, pay interest on half their value, and that the share of the expenses of keeping up the track to be paid by each company should be fixed upon a wheelage basis.

10. MORTGAGE — NOTICE — REFERENCE IN RECORDED DEED TO ONE NOT RECORDED.

Where a deed conveying a right of way to a railroad company recited that it was executed in pursuance of a contract between the grantor and grantee, and stated, towards its close, that the conveyances "of the said right of way in the deed mentioned are made subject to the terms and conditions upon which the same were granted to the party of the first part," and the contract referred to was not recorded, but another contract of even date therewith, referring to it, and limiting the grantor's rights. was recorded, *held,* that persons to whom the grantee's successor mortgaged its road are chargeable with notice of the terms and conditions of said contracts, and are bound thereby.

11. RAILROAD COMPANIES — RIGHT OF WAY, DEFINED — CONSTRUCTION OF CONTRACT.

The tripartite agreement of August 11, 1875, between the Forest park commissioners, the St. Louis County Railroad Company, and the St. Louis, Kansas City & Northern Railroad Company, construed, in connection with the contract of even date therewith between the last two parties; and *held* (1) to form a part of the latter contract; (2) to be upon sufficient consideration, and binding; (3) to have bound the St. Louis, Kansas City & Northern Railroad Company to permit other railroads to use its right of way and track, not only through Forest park, and the non-contiguous tracts, through which the St. Louis County Railroad Company had a right of way, but also through all tracts intervening between said park and the Union depot, in St. Louis, through which the St. Louis, Kansas City & Northern Railroad Company might thereafter obtain a right of way from other parties; (4) to have meant by the term "right of way" the strip of land upon which a railroad company constructs its roadbed; (5) to have entitled the St. Louis, Kansas City & Northern Railroad Company, and its successors, to the first right to use its right of way, not limited to its necessities, but as broad as its conveniences, and to have entitled other roads, subject to such prior right, to the use of said right of way, including, if necessary, the owner's tracks.

In Equity.

*Noble & Orrick* and *Dyer, Lee & Ellis,* for St. Louis, K. C. & C. R. Co.

*Leverett Bell,* for City of St. Louis.

*Wager Swayne, Wells H. Blodgett, Warwick Hough,* and *H. S. Priest,* for defendants.

BREWER, J. The intervenors represent that the Wabash road is in the possession of receivers appointed by this court, and that such road is the owner of a right of way passing through Forest park, and then easterly

to the Union depot, in the city of St. Louis. They further represent that said road holds said right of way subject to use by other railroads, upon reasonable terms; ánd seek, through their petition of intervention, an order from this court directing the receivers to permit the St. Louis, Kansas City & Colorado Railroad Company, one of the petitioners, to run its cars and engines over the tracks of the Wabash upon said right of way. They base this claim, not upon any reserved right in the state to a new exercise of the power of eminent domain, but upon two contracts made on the eleventh day of August, 1875. We have therefore no inquiry to make as to the power of the state to condemn a partial use of an existing railroad track in behalf of a new railroad company. No condemnation is here sought, nor proffer made of any condemnation money. Neither have we any inquiry as to the power of the state to compel one railroad company to permit the use of its right of way by another. The petitioners rest their claim alone on the contracts, and the question is therefore narrowed to the matter of a contract right. While this may narrow, it does not belittle, the question; nor can we be insensible that important rights and interests are involved in the correct solution of this question. We have, on the one hand, the city of St. Louis, —a large commercial city,—anxious to do everything that it may to further and extend its commercial interests, and urging that a new railroad company may have access to the center of passenger business in the city, and the new company itself, projecting and building a line westward through the state of Missouri, pressing in like manner for such access; and, on the other hand, a large corporation, with extensive lines, which has purchased and paid for a most valuable right of way, admitting it to the Union depot of the city, eager to protect its property interests, and to preserve its right of way free for its own use,—anxious also, doubtless, to prevent that competition in business which a new road occasions. The parties on both sides are earnest and strenuous, for the interests to be affected by the decision are important. We are fully sensible of this importance, and have given the matter the most careful consideration.

The facts upon which the claims of the petitioners are based are these:

In 1871 the St. Louis County Railroad Company was organized for the purpose of building a narrow-guage road from the city of St. Louis to Creve Cœur, a distance of about 16 miles. Its proposed route crossed diagonally the north-eastern part of what is now Forest park. That ground at the time belonged to one W. D. Griswold, and from him, the same year, the railroad obtained a deed to the right of way. In 1872 the general assembly passed an act entitled "An act to establish Forest park." By section 5 of the act the control and government of the park was placed in the hands of a board of commissioners. These commissioners, in the fall of 1872, made an agreement with the County Railroad, changing the location of the right of way granted by Griswold, and enlarging its width from 40 to 70 feet. In the winter of 1872 and 1873, the supreme court of Missouri decided that the act to establish Forest park was unconstitutional and void. Of course, with the downfall of

the act, went all contracts and arrangements made by the park commissioners. The title of the County Railroad to the right of way granted by Griswold remained as it originally existed, unaffected by the attempted agreement with the park commissioners.

In 1874 the general assembly passed a new act to establish Forest park. This act was adjudged valid. By it, also, the government and control of the park was vested in a board of commissioners. In section third, which provided for the vesting of the title to the property in the people of the county by general condemnation proceedings, was inserted this proviso:

"Provided, that nothing in this act shall prevent the St. Louis County Railroad from using and occupying a right of way of the width of not more than seventy feet through the north-eastern portion of said Forest park; the said railroad shall only enter the park through Duncan's subdivision on the east side of said park, and, running westwardly on the northern side of the River Des Peres, shall pass out of said park at a point on the northern line thereof, east of Union avenue; and provided, further, that no switch or siding shall be constructed by said railroad company in said park, nor shall more than one depot be established in said park, and that shall be for passengers only; and provided, further, that the grade of said railroad, as far as the same runs through Forest park, shall be approved by said Forest park commissioners."

The route mentioned in this proviso departs from the route named in the Griswold deed, and comes more closely to that named in the agreement of 1872 between the County road and the park commissioners. In addition to this right of way through the park, the County road proceeded to acquire title to certain tracts and parcels of ground along its route from the eastern boundary of Forest park to the Union depot. These tracts were not contiguous so as to form a continuous right of way, but were separate, and with much intervening space between.

The St. Louis, Kansas City & Northern was the owner of a standard-guage railroad extending from St. Louis to Kansas City, with a branch running northerly from Moberly. It had for years entered St. Louis along the levee, reaching the city on the north side. Desiring to enter the Union depot, it proceeded to lay off a line from Ferguson, which ran parallel, or nearly so, with the line of the County Railroad through the park, and thence easterly to the Union depot. Such was the situation when the contracts which are the basis of the present claim were executed.

The first of these contracts was between the St. Louis County Railroad, party of the first part, and the St. Louis, Kansas City & Northern Railroad, party of the second part,—companies which, for convenience hereafter, may be called respectively the County Company and the Kansas Company. By this contract the County Company agreed to convey to the Kansas Company an undivided one-half interest in the right of way through Forest park, and a strip 28 feet in width through the several tracts owned by it, between the eastern line of Forest park and the western limit of the city, and a strip 30 feet in width through the various tracts owned by it eastward from those limits to the Union depot. In consideration of this the Kansas road was to pay $125,000. This con-

tract further provided that the right of way through the park, as well as a tunnel and cut contemplated just east of the park, were to be used in common by the two roads. Beyond that, eastwardly to the depot, the contemplation was of two separate rights of way, with independent tracks for each road; with a further provision that at two places, unless the County road could obtain the use of the street, it should be permitted to put a third rail on the right of way of the Kansas road. It was further provided that the Kansas road should construct and maintain the road-bed through the park, and the tunnel and cut, hereinbefore referred to; also that the County Company should, within two years, pay to the Kansas Company one-half of the cost of this construction; and that, on failure thereof, it should forfeit all right and interest in said right of way, and be forever excluded therefrom.

The second contract, made the same day, was what is known as the "tripartite agreement;" the parties to it being the commissioners of Forest park, party of the first part, the County Company, party of the second part, and the Kansas Company, party of the third part. Each of these contracts refers to the other, and, while the tripartite agreement was executed after the other, they are so connected as properly to be considered parts and parcels of one contract.

This tripartite agreement recited that "said Forest park commissioners, in consideration of the relinquishments, agreements, and stipulations hereinafter contained on the part of said party of the second part, do hereby accept and approve the line and grade of said railroad as laid down and described upon the accompanying plat and profile hereto attached, and forming part of this agreement; and said line and grade, in case there is no forfeiture of this agreement, is hereby fixed as the sole and finally established right of way to which said party of the second part is entitled by statute, or otherwise, through said park, or any part thereof; and the width of said right of way, as established by statute, is hereby reduced from seventy (70) feet, and fixed at forty-two (42) feet, between its outer points." Then that the County road, in consideration thereof, relinquished 28 feet off the 70 feet established by statute for its right of way through Forest park; with the proviso that, in case the right of way described and established should not be promptly placed at the disposal of the County road, this agreement should be set aside, and become null and void. It then, in eight successive paragraphs, provided for the manner of constructing the road-bed through the park by the county road, and also for the building of the depot outside the right of way, but immediately adjoining thereto. The ninth paragraph reads as follows:

"Said party of the second part shall permit, under such reasonable regulations and terms as may be agreed upon, other railroads to use its right of way through the park, and up to the terminus of its road in the city of St. Louis, upon such terms, and for such fair and equitable compensation, to be paid to it therefor, as may be agreed upon by such companies."

The tenth paragraph is an admission by the County road that its right of way is not exclusive, and that this agreement is not to be construed

as limiting or impairing the right of the park commissioners to grant another right of way to any other railroad company. The twelfth paragraph is as follows:

"And whereas, for the purpose of enabling the party of the third part to reach the Union depot of St. Louis, Missouri, an amicable agreement and arrangement for a right of way outside of and through said Forest park has been made and entered into by and between the parties of the second and third parts, and in pursuance thereof the parties of the second and third parts are to enter upon and enjoy the right of way, and all the rights, privileges, immunities, powers, improvements, and property belonging to, or vested in, or that may belong to, or vest in, the party of the second part, in common, in, upon, and through said park, under certain regulations, terms, and conditions agreed upon by and between said parties therein; and whereas, the party of the third part, in further pursuance of said last-named agreement, is about to construct, maintain, and operate a railroad, in, upon, and through said park, at great expense, and to engage in other great outlays, and to assume other heavy burdens and responsibilities, to be of advantage to said third party, through the continued enjoyment of said right of way and other rights, privileges, powers, franchises, immunities, improvements, and property in, upon, and through said park: now, therefore, in view of the premises, and as inducements to said party of the third part to proceed as intended, the party of the first part does hereby grant and convey unto, and license and permit, the said party of the third part, its successors and assigns, to have, hold, use, and enjoy said right of way, in, upon, and through said park, in common with, and to be held and enjoyed jointly with, said party of the second part, and its assigns, on the terms of the said contract between them, and under the same terms and conditions as are hereby and hereinbefore imposed upon said party of the second part, and which are hereby assumed by said party of the third part as to improvements, except as to building a depot and switch in said park, which the party of the second part is to do itself; or, in case said party of the second part, its successors or assigns, should forfeit its said rights, privileges, and franchises in, upon, and through said park, or from any cause cease to have, maintain, and enjoy the same, then it is hereby agreed and covenanted that the party of the third part shall not also be excluded from said park, but shall, with its successors and assigns, continue to have, maintain, and enjoy all of said rights, privileges, immunities, franchises, improvements, and property on the terms hereinbefore set forth, continuously and forever."

The thirteenth paragraph provides that the Kansas road shall have no depot in the park. The fourteenth paragraph, so far as it is material, is as follows:

"Now, therefore, in consideration thereof, and of the agreement of the party of the third part herein, the party of the first part herein accepts the agreement and contract of the party of the third part herein to execute, perform, and comply with all of the terms, provisions, and things herein mentioned to be done, performed, or complied with, as to said improvements, except as aforesaid, by the party of the second part hereto, so far as assumed as aforesaid, releasing it therefrom, and in consideration thereof the party of the third part hereto covenants and agrees with the other parties hereto that it will, in lieu and stead of the party of the second part hereto, do, perform, and comply with all the terms and provisions, matters and things, herein expressed, to be done, performed, or complied with by said party of the second part, as to said improvements, except as aforesaid, subject to the terms and conditions in said agreement of even date herewith contained; and it is

hereby expressly covenanted and agreed that a compliance by the party of the third part for itself, or for itself and the party of the second part jointly, in the construction of said railroad in, upon, and through said park, tunnel, and cut, in accordance with the terms of this agreement, shall be taken and accepted as a performance of the conditions imposed upon said party of the second part; and it is expressly covenanted and agreed that all and every part of the work, its kind, description, and extent, to be performed by either of said parties of the second or third parts, is hereinabove expressed, and neither of said parties shall be held or required to do or perform any other or further work and conditions than those hereby definitely set forth."

It will be observed that by the ninth paragraph the County road agreed to permit the use of its right of way by other railroads. Whether a like obligation was assumed by the Kansas road depends upon the last sentence in the twelfth paragraph, which purports to grant to the Kansas road the right to occupy and enjoy the right of way through the park jointly with the County road, "on the terms of the said contract between them, and under the same terms and conditions as are hereby and hereinbefore imposed upon said party of the second part, and which are hereby assumed by said party of the third part as to improvements, except as to building depot and switch in said park, which the party of the second part is to do itself."

It must be conceded that the meaning of this language is not perfectly clear. It is claimed by the defendants that the words, "as to improvements, except as to buildings," etc., qualify not only the immediately preceding clause, commencing "and which are hereby assumed," but also the one prior, commencing "and under the same terms and conditions;" and therefore that the terms and conditions as to improvements are those alone cast upon the Kansas road. This would make the two clauses but a single compound one, qualified by the following relative clause "as to improvements," etc. As against this, it must be observed that, grammatically, a relative clause generally qualifies its immediate antecedent, and therefore in this case would refer simply to that clause which provides for the assumption by the Kansas road. This natural grammatical construction is strengthened by the punctuation,—a comma after the words "party of the second part," and none after the words "party of the third part," which seems to separate the entire first clause from the second and its qualifying terms. I know that the matter of punctuation is never relied upon to defeat the obvious intent; but, when the meaning is doubtful, the punctuation is certainly a matter tending to throw light upon it.

Further, there are not simply two, but really three, antecedent clauses; the first one being, "the terms of the said contract between them;" that is, the two railroad companies. Very clearly this qualifying clause does not refer to that, and therefore it should not be held to qualify the second, unless the obvious intent compels such construction. It is objected that the clause commencing "and which are hereby assumed," is, under this construction, superfluous. I think not. These improvements called for the expenditure of money, and the idea seemed to be that the Kansas road should not only hold its rights upon certain condi-

tions, but that, as to those involving the expenditure of money, it should expressly assume the performance. There is a manifest difference between a conveyance subject to a mortgage and a conveyance in which the grantee assumes the payment of the mortgage. This distinction evidently dictated the form of expression used.

Again, it is insisted that, by the fourteenth paragraph, the parties expressly declared what they meant by the terms and conditions imposed upon the County road; for, in next to the last sentence quoted, it is provided that "a compliance by the party of the third part for itself, or for itself and the party of the second part jointly, in the construction of said railroad in, upon, and through said park, tunnel, and cut, in accordance with the terms of this agreement, shall be taken and accepted as performance of the conditions imposed upon said party of the second part." But this language, which, while taken by itself, seems very broad, must be construed in reference to the context. From the opening language of the paragraph it appears that the parties were stipulating concerning the matter of improvements alone, and in reference to the party by whom said improvements should be made; and when in this sentence certain work done by the Kansas road is declared to be taken and accepted as a performance of the conditions imposed upon the County road, it must be taken as referring simply to the conditions in respect to improvements. This construction is strengthened by the language following this sentence, in which it is said that neither of said parties—neither the County road nor the Kansas road—"shall be held or required to do or perform any other or further work and conditions than those hereby definitely set forth." Certainly it was not meant by this to nullify the provisions of the ninth paragraph, or release the County road from the stipulation therein contained. Making the fourteenth paragraph refer simply to the matter of improvements, as indicated by its opening sentence, it becomes consistent and harmonious with the balance of the agreement.

Further, it is insisted that, if it was the intent of the parties that such an important obligation should be assumed by the Kansas road, the language imposing it would have been more definite, precise, and clear, and that the very uncertainty of this language precludes the idea that it was the intent of the parties that this obligation should be cast upon the Kansas road. Counsel speak of it as "a ghastly blunder," and argue that, from language of such doubtful import, no imputation of such a blunder ought to be cast upon the then representatives of the Kansas road. Probably at that time—more than 10 years ago—the assumption of such an obligation did not seem to be a matter of serious moment. Indeed, the very language in which the ninth paragraph is couched, and by which unquestionably such an obligation was intended to be cast upon the County road, lacks, as we shall hereafter see, the precision, certainty, and fullness which, in view of the present importance of such a stipulation, would to-day be expected.

Again, it is insisted that there was no consideration for this stipulation on the part of the Kansas road. It is urged that the County road had, by virtue of its deed from Griswold, and the act establishing Forest

park, a clear legal title to a right of way, 70 feet in width, through the park,—a title beyond the possibility of interference by the park commis-sioners; that the only power left with the park commissioners was in respect to the grade; that the County road had, under the statutes, a right to convey any or all of such right of way to the Kansas road, and that, having such right of way, an attempt by the park commissioners to impose this condition was unauthorized; that the assumption by the Kansas road was without consideration, and not binding. To this it may be replied that the park commissioners accepted and approved the proposed grade; that by the last clause of the tripartite agreement they agreed to build and maintain certain arched entrances and exits from the park, and that, as a matter of fact, they did thereafter spend many thousand dollars in such work; and, finally, that the agreement indicates on its face that it was made as a compromise of certain claims on the part of the respective parties. The law favors compromises,—upholds them as considerations of the covenants of the compromising parties. The park commissioners claimed the right to grant a right of way through the park. By the terms of this tripartite agreement, they conveyed this right, and approved the proposed grade, and contracted to do work along that line. Clearly there was consideration for this stipulation. While I concede that the language is not entirely perspicuous, yet I think the true construction is that the Kansas road assumed the stipulation of the ninth paragraph, that there was sufficient consideration, and therefore a binding stipulation upon it.

For further argument tending to show that this is the true construction, and that there was sufficient consideration, I refer to the elaborate opinion of the special master filed in this cause.

A solution of this question only opens the door to others, some of which are even more embarrassing and difficult of solution. It is insisted that by this stipulation the railroad company agreed to permit the use of its right of way, and did not agree to permit the use of its track or road-bed, and that the road should not be bound, therefore, beyond the very letter of its obligation. Also that this agreement was not one running with the land; that it bound only the party assuming it, as a merely personal covenant; and while, therefore, binding on the Kansas road, and also the Wabash Company, into which it was consolidated, it does not bind the mortgagees, who take as purchasers, and as purchasers without notice. Further, that the use by other railroad companies stipulated for was to be only on such compensation as should be agreed upon by the parties, and that, in the absence of such agreement by the parties, the court had no power to determine the amount of compensation, or enforce the contract. And, again, that the contract is one which in its nature is not susceptible of specific enforcement, because the duties required by it, and which are sought to be enforced, are of a continuous character, and require the personal skill and cultivated judgment of the officers of the defendant road; and therefore the matter cannot be disposed of by one decree, but will require the permanent retention of the case, and constant supervision by the court. Still, again, it is insisted that

there is no mutuality in the contract, and that therefore it is one that courts will not specifically enforce; and, finally, that, if all these objections fail, the amount of compensation reported by the master is not fair and adequate, but should be largely in excess of that amount.

Of these in their order.

The language of the ninth paragraph, under which, as before noticed, intervenors must claim, is that the party of the second part shall permit other railroads to use its "right of way." Now, the term "right of way" has a twofold signification,—it sometimes is used to describe a right belonging to a party, a right of passage over any tract; and it is also used to describe that strip of land which railroad companies take upon which to construct their road-bed. Obviously, in this paragraph, it is used in the latter sense. Through both of these contracts the terms "right of way," "track," and "road-bed" frequently appear, and in all cases the term "right of way" is used as descriptive of the strip above referred to. Notably, in the fifth paragraph, is the distinction between the "right of way" and the "track" disclosed, in which it is provided that the depot shall be wholly outside of the right of way, but immediately adjoining the track. Now, the right of way through the park, as given by the Griswold deed, was 40 feet; as fixed by the contract with the Forest Park commissioners, was 70 feet; and by this present contract, 42 feet. So the County road conveyed to the Kansas road, outside of the park, a strip either 30 or 28 feet in width for its right of way. My thought, at first, was that the intervenors could only claim a right to use so much of this right of way as was not, in fact, occupied by the track of the Wabash, and that all that was intended by this ninth paragraph was to permit other railroad companies to occupy and use so much of the Kansas road's right of way as it did not itself occupy and use; but, after reflection on the arguments of counsel, I have been led to the conviction that this was too narrow a construction, and was not the real intent of the parties. The master, in his report, shows that the entire right of way is occupied by tracks and sidings, so that there is no room for another and independent track; and as there is nothing to show that this occupation has not been made in good faith, and to supply the needs of the Wabash Company, if my first interpretation had been correct, the intervenors would plainly be without any rights. I think, however, the true construction is this: that the Kansas Company was to have the first right,—a right not limited to its necessities, but as broad as its convenience. Subject, and only subject, to such prior right, other companies were to have the use of the right of way, and if the respondent's business compelled the occupation by its tracks or sidings of the entire right of way, but the convenience of its business would permit the use of those tracks and sidings by another road, then such other road would be entitled to the use of both the right of way and the tracks and sidings. This construction is, I think, in accordance with the obvious intent of the parties, who were contracting for general rights, and not fixing the specific details.

With reference to the next matter, it is not seriously contended that the obligations assumed by the Kansas road are not also binding on the Wabash, because the latter is a mere consolidation of the former with other companies; but the contention is that the mortgagees take as purchasers, free from any burdens which do not run with the land, or of which they do not have either actual or constructive notice. On the same day on which these contracts were executed the County road executed a deed to the Kansas road of the undivided half of the right of way through the park, and of the separate portions of the various parcels of ground eastward, to the Union depot, which deed was recorded two days thereafter. This deed recites that it is executed "in pursuance of the terms of a certain contract made and executed by and between the parties of the first and second parts hereto, and dated August 11, A. D. 1875, and in full satisfaction of so much of said contract as relates to the conveyance of certain pieces of land and right of way to said party of the second part by said party of the first part." Also, towards the close of the instrument, after providing for a transfer of an undivided half of all right of way, and all other rights and privileges, franchises, powers, and immunities owned by or vested in the party of the first part, in, through, or upon Forest park, it has these words: "All of which conveyances of the said right of way in this deed mentioned are made subject to the terms and conditions upon which the same were granted to the party of the first part." Now, the tripartite contract was recorded prior to the consolidation of the Kansas road with the Wabash, and prior to the issue of the mortgages referred to. There being express reference, in the deed from the County road to the Kansas road, to the contract in pursuance of which the deed is made, and an express declaration that the conveyances are made subject to the terms and conditions upon which the grantor received them, it seems to me that there is enough to cast upon even a *bona fide* purchaser notice of the terms and conditions of these contracts. It is argued with great force, however, by counsel for the respondents, that even if the purchasers were charged with notice of these terms and conditions, as attaching to the lands described in the deed, inasmuch as the Kansas road obtained a large portion of its right of way between Forest park and the Union depot from other sources, it took these latter portions free from any burden cast upon the lands specifically conveyed by the County road. "Can it be," he says, "that a condition in a deed of a few feet of the right of way, in a long line of three hundred miles, casts a burden on the entire line, to be assumed by every succeeding purchaser?" I might answer this extreme case by a reverse question: Can it be possible that a condition attached to substantially the entire right of way of this long line of road can be defeated by the fact that some few feet have been acquired by a deed free from such condition? But these extreme cases do not constitute the practical matter before us. Here the County road had an incomplete right of way through the park, and to the Union depot. A share of this incomplete right of way it conveyed to the Kansas road, subject to certain conditions. Can it be that the

completion by the Kansas road of this right of way, by purchase of intervening and isolated tracts, destroys the entire value of the conditions? Looking at this matter in a practical way, and from a reasonable standpoint, I think the answer to this question must be in the negative.

Passing to the next matter, the ninth paragraph contemplates that the conditions and compensation for use should be determined by personal agreement. As there has been no such personal agreement, counsel deny the power of the court to interfere, and say that any interference would be the making of a new contract. They refer to the familiar cases in which parties, in their contract, have stipulated for a particular mode of determining rent or other compensation, as by arbitration, etc. In such cases, courts have held that parties cannot ignore such stipulations, and invoke the aid of the courts, in the first instance, to determine. But here the respondents deny the right. They never advanced to the position of a mere disagreement about the amount of compensation, or terms of use. As the question of right must be settled before the question of compensation is presented, and as the respondents, by denying the right, have forced the intervenors to an application to the court, it seems to me that the court, taking cognizance of the question of right, is bound to determine the whole case, and settle both the right and the compensation. It is a general doctrine that a court, once taking jurisdiction of a controversy, is bound to continue that jurisdiction up to the final determination of the entire controversy. The stipulation provided for use under such reasonable terms and regulations, and for such reasonable compensation, as should be agreed upon. It cannot be that the mere whim and caprice of the one party—a blind refusal to come to any agreement—can nullify the entire force of the stipulation. It would make the right of the intervenors a mere barren right. It would nullify the entire stipulation, and operate simply to give to the respondents that which without it they had,—the privilege of permitting other roads to enter. It would be mockery to call such a provision a stipulation for a right.

The next matter is one of exceeding difficulty. The stipulation is general in its nature,—contains no provision as to details. Is it thereby rendered so incomplete that the courts may not enforce it? That a court may enforce, by its decree, either a contract or legislative right to the use by one railroad company of the tracks of another, cannot, it seems to me, under the intimations of the supreme court in its recent decision in the *Express Cases*, 6 Sup. Ct. Rep. 542, be doubted. In England legislation has been had in reference to this matter, and the right thus granted has been enforced by the decrees of courts; and so, if this contract had provided the details, so that all that the court would have to do would be to declare by its decree that the plaintiff was entitled to the benefit of such contract, the duty of the court would seem plain. Does the omission of the details destroy the power of the court, and practically nullify the force of the stipulation? or was it the intent of the parties simply to contract for a right, and leave with the court, in the absence of the agreement of parties, the full determination of all the de-

tails? I am aware of the rule that courts are not bound to relieve parties from mistakes or omissions, or to complete contracts which parties have left incomplete. But it is also true that ofttimes, at the making of the contract for a right, it may be impossible to determine details, or the changing situation of affairs may indicate that details also must be subject to modification, and therefore should not be definitely prescribed, and should be left to settlement by agreement or decree at the time the right is insisted upon. In such cases, if the right is absolutely contracted for, and the details are of a nature which courts may properly fix and settle, then, I take it, the courts should not hold the contract incomplete, but determine the right, and also prescribe and settle the details. An act of the legislature might be passed giving to one company the right to use the tracks of another, and prescribing all the terms and conditions,—the details for the use. I take it, an act of the legislature would, also be valid which simply declared that one company should have the right to use the tracks of another upon such terms and conditions as the parties might agree upon, or should be prescribed by the courts; and, if such a legislative act would have to be adjudged valid and complete, I see no satisfactory reason why courts may not also hold sufficient and valid a mere contract for the right, and, determining the right, also settle and prescribe the terms of the use. It is true that such a decree cannot be executed by the performance of a single act. It is continuous in its operation. It requires the constant exercise of judgment and skill by the officers of the corporation defendant; and therefore, in a qualified sense, it may be true that the case never is ended, but remains a permanent case in the court, performance of whose decree may be the subject of repeated inquiry by proceedings in the nature of contempt. It is also true that in the changing conditions of business the details of the use may require change. The time may come when the respondent's business may demand the entire use of its tracks, and the intervenor's right wholly cease. But other decrees are subject to modification and change, as in decrees for alimony. The courts are not infrequently called to modify them by reason of the changed condition of the parties thereto. So, when a decree passes in a case of this kind, it remains as a permanent determination of the respective rights of the parties, subject only to the further right of either party to apply for a modification upon any changed condition of affairs; and, so far as any matter of supervision of the personal skill and judgment of the officers of the respondent corporation, the contract, in terms, provides that the regulation of the running of trains shall be subject to the control of the officers of the respondent. While I concede that there is force in the objection that this must remain, in a qualified sense, a continuing case in the courts, with the constant duty of supervising the acts of the respondent, yet it seems to me that where there is a right there must be a remedy, and that the mere machinery of court procedure is flexible enough to adapt itself to the necessities of protecting a right. Clearly, a mere action for damages would be a grossly inadequate remedy. Clearly, the public interests justify, if they do not compel, the enforce-

ment of this right, and so, with much hesitation, I have come to the conclusion that this objection cannot be sustained.

As to the objection on the ground of the want of mutuality in the contract, I think it of little force. The respondent has been paid for the privilege that is now claimed. The consideration, as I have heretofore shown, was ample; and, when a party has received payment for a privilege, I do not think it can resist the enforcement of that privilege on the mere ground that it cannot compel the other party to continue in its enjoyment.

The final matter is that of compensation. In this I think the master erred. He fixed the value of the right of way at a million of dollars; and reported that, in his judgment, the share of the interest on this value, and in the expenses of keeping up the track, which the intervenor company should pay, should be fixed upon a wheelage basis. So far as respects the mere matter of keeping up the track, I see no reason to doubt the justice of the rule fixed by the master; but, in regard to the interest on the value, I think the intervenor should pay one-half of that, and for these reasons: It is a familar fact that in a large city like St. Louis, along the track of an important railroad, within the city limits, are built large manufacturing establishments, warehouses, and other buildings, for the convenient transaction of business between the carrier, on the one hand, and the manufacturer and the merchant, on the other. Another road coming over the same track not only uses the property, of great value, which the company owner has in the first instance paid for, but also shares in the benefit of access to all these manufactories, warehouses, etc. It thus places itself in competition with the original company for this valuable business. Such competition may operate to diminish the business of the original company, or compel it to lower its rates to preserve the business. In either way, it operates to the serious detriment of the original company. The new company comes in as an equal competitor. It shares in all the benefits of this business, and it may share equally. Under those circumstances it seems to me no more than fair that a new company, which crowds itself into an equal access to such benefits and such privileges, should pay an equal share of the interest on the value of the property. Hence I shall sustain the objections of the respondent to the report of the master, so far as concerns the amount of compensation, and I think that the intervenor company must pay one-half the interest on the value, and its share of the cost of keeping up the track, determined upon a wheelage basis. In other respects, the report of the master will be confirmed.

In conclusion, let me say that I have given the various questions here presented a most careful examination. I am fully sensible of the many difficulties that have attended the solution of these questions, and my conclusion has been reached after much hesitation. I have endeavored to preserve fully the property rights of the respondent company. At the same time I have been deeply impressed with the truth that railroads are performing a *quasi* public service, and that, so far as vested property interests are not impaired, such construction should be given to all con-

tracts and legislation as will make these public servants most fully subserve the interests and welfare of the general public.

TREAT, J.    I concur fully with so much of the foregoing opinion as establishes the intervenor's right to the entrance into St. Louis over respondent's right of way and tracks, subject to reasonable regulations by respondent for the safe conduct of persons and property in the common use thereof.    This case involves a very difficult and complicated inquiry, and the court has been embarrassed by the many obscure details of the different contracts.    After reading and analyzing with the most painstaking care the special and general provisions of the contracts in question, no other conclusion could be reached than that stated by my brother judge, viz., that the intervenor has a right to the use of the track and right of way of the respondent.    The very terms of the original contracts to which the respondent succeeds cast upon it the obligations connected therewith.    In other terms, it takes *cum onere*.    Hence I concur fully with my brother judge that the right of user exists; but I differ as to the propriety or duty of fixing the measure of compensation in this stage of the case.    Those terms are, by the contract, to be agreed upon by the parties; and why should they not have an opportunity to come to an agreement?    True, the respondent denies the right of intervenor to the use of its track and right of way, and consequently, in the intermediate inquiry, refused to enter upon terms.    How could it make such terms without confessing intervenor's right?

It having now been decided, with full concurrence on my part, that the intervenor has the right claimed, the difficult proposition is thrust upon the court as to the terms of its enjoyment.    By the contract itself, those terms are to be settled by the parties.    Why should they not be permitted to do so?    If, hereafter, it should occur that through fraud, attempted extortion, or otherwise, the right of user is to be practically defeated, the court would necessarily lay its hand upon the transaction, and enforce the respective rights of the parties as justice might demand. It seems to me that the measure of compensation should not be prescribed at the present state of the controversy, irrespective of the terms of the contract as to the mode of determining the same, the more especially as the intervenor has no exclusive right in the premises.    Another railroad corporation may appear next year, and insist upon its rights under the contract; and so on, from time to time, successive corporations.    The respondent must make, necessarily, the proper regulations for safety and otherwise, pertaining to the use of a common track entering a large city like St. Louis, where the most complicated details are needed for approaches to a common depot.

It is true that the *Express Cases* rested on an independent proposition, and consequently cannot govern this case.    Here is a distinct contract by which the respondent is bound.    It took *cum onere*.    By the terms of the obligation, others could use, subject to its regulations, the common track and right of way, upon such consideration as the parties might agree upon.    They have not as yet agreed, and, since this determination of the

right of intervenor, no opportunity has been given them to consult and agree. It may be that they can do so, more wisely and justly than the court, if opportunity is given. It is obvious that courts are not, without fullest evidence before them, equal to the task of prescribing how railroads should be operated in their minute details, one with the other, in the interchange of traffic, or use of common tracks, depots, etc. When difficulties arise, as now, where rights between them are to be determined, the adjustment of details should be left where the contract leaves it; otherwise, not only great injury and confusion may occur, but the court be compelled to retain an indefinite control of the case, to meet ever-shifting contingencies, as to transportation, new improvements, advancing trade, etc. In my view of this case, the question of compensation between the parties should not be decided now, but reserved for further consideration.

There are some minor elements as to the *status* of the parties, technically, which may be worthy of further consideration, should cause therefor be presented. By this is meant the position occupied by the purchasing committee under the terms of sale heretofore made.

The result is that I fully concur in the foregoing opinion, except so far as the same determines the measure of compensation between the parties, not that the rule may or may not be correct, if the court is compelled finally to pass upon the same, but merely that such action is premature, and should be reserved for further action, if needed.