WESTERN UNION TELEGRAPH CO. v. PENNSYLVANIA CO..

(Circuit Court of Appeals, Third Circuit. May 2, 1904.)

No. 24.

**1. CONTRACTS—DURATION—PRESUMPTION.**

If a contract is not revocable at the will of either party, or otherwise limited as to its duration, by its express terms, or by the inherent nature of the contract itself with reference to its subject-matter or its parties, it is presumably intended to be permanent and perpetual in the obligation it imposes.

**2. SAME—RIGHT TO TERMINATE AT WILL—AGREEMENT FOR CONSTRUCTION AND OPERATION OF TELEGRAPH LINE.**

A contract between a railroad company and a telegraph company provided for the construction, maintenance, and operation of a telegraph line along the right of way of the railroad company, which was to furnish and place the poles and cross-arms, while the telegraph company was to furnish the wire, insulation, and instruments, and operate the line, sending messages relating to the railroad business free, and having itself the commercial business. The railroad company was given the right to string a wire for its own business, and the telegraph company an additional wire, and provision was also made for the repair and renewal of the line. The line was built and operated under the agreement for many years, during which time it became an important part of the general system of the telegraph company, which, by mutual agreement, largely increased the number of its wires, and parol modifications were also made as to the expense of repairs and reconstruction. *Held*, that the relations created between the parties by the contract were not merely personal, as in cases of partnership, master and servant, and the like, but that rights of property and the user thereof, in the nature of an easement, were conferred on the telegraph company, and that, in the absence of any express provision therefor, no right in the railroad company to determine or revoke the same at will could be inferred from the silence of the contract in that respect, or from its terms, purpose, or inherent nature.

**3. SAME—VALIDITY—INVALID PROVISION.**

The fact that such contract contained a provision that the railroad company should not permit any other telegraph company or individual to build or operate a line of telegraph along its road, which was valid at the time the contract was made, but was rendered invalid by act of Congress of 1866, giving any telegraph company accepting its provisions the right to construct its line along any post road, does not affect the validity of other provisions for which it did not constitute the main consideration, nor the right to a specific enforcement of such provisions.

**4. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—NATURE OF RELIEF REQUIRED.**

A court of equity is not precluded from decreeing the specific performance of a contract because it is continuous in its operation, where the principal, if not the only, relief required is injunctive, to preserve the status quo which has existed between the parties for nearly 50 years, and to prevent the threatened termination of the contract by the defendant.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 125 Fed. 67.

¶ 4. Enforcement of contracts requiring continuous acts, see note to Berlinger Gramaphone Co. v. Seaman, 49 C. C. A. 103.

129 F.—54

Rush Taggart, for appellant.

George B. Gordon, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the Circuit Court for the Western District of Pennsylvania, entered upon a demurrer to an amended bill of complaint filed by the complainant below, the appellant here. The decree sustained the demurrer, and dismissed the amended bill of the complainant.

The suit is founded upon a written contract, entered into in the year 1856, and certain parol modifications thereof set forth in the bill, between the Western Union Telegraph Company and the Cleveland & Pittsburg Railway Company. The written contract filed as an exhibit and made part of the bill, is as follows:

"An agreement made and entered into this ——— day of October, 1856, between the Western Union Telegraph Company, of the first part, and the Cleveland & Pittsburg Railroad Company, of the second part, witnesseth as follows:

1st. The said Railroad Company is to put up, as soon as the work can be reasonably done, along the line of its road, from Cleveland to Rochester via Alliance and Wellsville, and also from Wellsville to Bellaire, a line of telegraph poles or posts of good timber, stripped of the bark, and permanently and securely set in the ground, thirty to the mile, not less than eighteen feet high above the ground, and not less than nine inches in diameter on an average, at the surface of the ground when set, with cross arms suitable for two or more wires, well and securely fastened to the poles.

2nd. The said Telegraph Company is to furnish wire, insulators, instruments, patents and everything except the posts or poles and cross arms, and complete said line with one wire and extend it upon the poles now up, or upon other poles equally good, along the Ohio & Pennsylvania Railroad, from Rochester to Pittsburg, and put said line in operation as soon after the poles are set as is reasonably practicable, and open offices at Cleveland, Hudson, Ravenna, Alliance, Wellsville, Rochester, Pittsburg, Steubenville and Wheeling, and such other places on the line as the said Railroad Company may designate and furnish instruments for; and the said Railroad Company is to pay to the said Telegraph Company the loss, if any, at any office on said line where the expenses amount to more than the receipts of the office for said line; and the said Telegraph Company is to send, free of charge, over said line, during ordinary business hours, all messages strictly pertaining to the business of said Railroad, including the ordinary family communications of its officers and agents, that may be required by any of the officers or agents, giving preference to messages of emergency or pertaining to accidents.

3d. The said Railroad Company is to pay to the said Telegraph Company, as soon as the said line is completed and in working order, thirty dollars a mile for the length of the wire, including that from Rochester to Pittsburg, and also to pass or convey, free of charge, over its said road all men and materials used or employed in building and operating said line.

4th. The said Railroad Company is to have the right at any time to put upon said posts, or cross-arms, a telegraph wire and work the same for its exclusive use, but not to send any messages thereon other than those pertaining to the business of the said railroad and the ordinary family communications of its officers and agents, at or from points where the said Telegraph Company may or shall have an office.

5th. The said Telegraph Company is also to have the right to string another wire for its own use upon said posts or poles at any part thereof.

6th. When the wire of the said Railroad Company, as provided for in article fourth, is down or out of order, the said Telegraph Company is to do the telegraph business of the said Railroad Company upon its wire or wires,

or any parallel wire it has or may have, and when the wire or wires of the said Telegraph Company is, or are, down or out of order it is to have the right to send its business free over the wire of the said Railroad Company, but not to interfere with or delay the telegraph business of the said Railroad Company.

7th. After the telegraph line is completed with one or more wires, the same is to be kept in repair by the said Railroad Company, and maintained in first rate working order, so far as practicable. But the said Telegraph Company is to furnish, or pay, to the said Railroad Company, the cost of the wires and insulators used and necessary in maintaining the wire or wires of the said Telegraph Company in good working order.

8th. The said Railroad Company is not to allow any other Telegraph Company or individual to build or operate a line of telegraph on or along its said railroad, or any part thereof.

9th. The said Railroad Company is not to be liable to the said Telegraph Company, or to any of the employés thereof, for any accidents or injuries to the said employés while traveling on the cars, free of charge, under this contract. Nor is the said Telegraph Company to be liable to the said Railroad Company for any damage or mistake in the transmission or delivery of messages.

In witness whereof," etc. (Executed by the seals of the companies and the hands of their presidents respectively.)

"It is understood that if the poles between Steubenville and Bellaire will answer for that line, new poles will not be required during the life of those poles. Also, that No. 9, good wire, shall be used, and that the poles shall be of sufficient size.                    Cleveland & Pittsburg Railroad Company,

[Seal.   C. & P. R. R. Co.]
              [Signed]                      By C. W. Rockwell, President.
[L. S.]        [Signed]                          E. Rockwell, Secretary."

"At a stated meeting of the Board of Directors of the Western Union Telegraph Company, held at the office of the Secretary, in the City of Rochester, on the 21st day of January. 1857, the following preamble and resolution were passed:

'Whereas, In the month of October, last past, this Company on its part, executed a contract between this Company, of the first part, and the Cleveland & Pittsburg Railroad Company, of the second part, providing among other things for the construction of a telegraph line along the route of the said railroad.

'And Whereas, the said Railroad Company has executed the said contract with the following supplementary clause, and in the following form, that is to say: "It is understood that if the poles between Steubenville and Bellaire will answer for the line, new poles will not be required during the life of these poles. Also, that No. 9, good wire, shall be used, and that the poles shall be of sufficient size." '

                                  The Cleveland & Pittsburg Railroad Company,
              [Signed]                      By C. W. Rockwell, Prest.
[L. S.]        [Signed]                          E. Rockwell, Secy."

"Resolved, That this Company assent and agree to said supplementary clause, and that the President and Secretary, on behalf of this Company, execute any paper necessary to verify the said assent to said clause."

"This certifies that the foregoing is a true extract from the records of the Western Union Telegraph Company.

June 22, 1857.              [Signed]        H. Sibley,
                                  Prest. of the W. U. Tel. Co.
                            [Signed]        I. R. Elwood,
[Seal W. U. T. Co.]                         Secy. of the W. U. Tel. Co."

The material allegations of the bill are as follows:

In paragraphs 2 and 3, the complainant sets forth that the "Western Union Telegraph Company," the complainant, is a telegraph company and a corporation duly organized under the laws of the state

of New York, and that the "Pennsylvania Company," the defendant, is a corporation organized under the laws of the state of Pennsylvania, and in possession of and operating a line of railroad known as the "Cleveland & Pittsburg Railroad," extending from the town of Rochester, in the state of Pennsylvania, through the states of Pennsylvania and Ohio to the city of Cleveland; also from the mouth of Yellow creek, near Wellsville in the state of Ohio, via Steubenville, to Bellaire; and also from Bayard to New Philadelphia in the state of Ohio; that the said Cleveland & Pittsburg Railroad is a corporation organized under the laws of the states of Pennsylvania and Ohio, and in October, 1871, it executed a lease, for the term of 999 years, of its said line of railway to the Pennsylvania Railroad Company, a corporation organized under the laws of the state of Pennsylvania; that in the year 1873 this lease was assigned to the defendant, the Pennsylvania Company, which has ever since operated the said railroad under the same.

Paragraph 4 of the bill sets forth that the complainant was organized as a telegraph company in the year 1851, and has been continuously since that time engaged in the work of constructing and operating telegraph lines, and has acquired a continuous system of telegraph lines, which now extends through all the states and territories of the United States and into portions of the Dominion of Canada, and connects with telegraph lines of Central and South America, and by submarine cables with the telegraph systems of foreign countries; and that among the lines of telegraph forming an important part of said system of said complainant, and connecting with its main office in the city of New York, and with other lines of telegraph leading to the important commercial centers of the West and Southwest, are the lines of telegraph over and along the said Cleveland & Pittsburg Railroad.

In paragraph 5, complainant states that the lines of telegraph along the said Cleveland & Pittsburg Railway were originally constructed by the complainant under the contract entered into in October, 1856, between complainant, the Western Union Telegraph Company, and the Cleveland & Pittsburg Railroad Company, above recited as Exhibit 1, attached to and made a part of said bill of complaint.

In paragraph 6 of the bill, complainant alleges that at the time of the making of said contract, and for many years thereafter, the said complainant controlled within the territory covered by said Cleveland & Pittsburg Railroad, and the territory contiguous thereto, the patents controlling the art of telegraphy, without which no person or corporation could lawfully engage in sending messages by telegraph; that after the construction of the said telegraph line, as provided in said contract, complainant and the said Cleveland & Pittsburg Railroad Company carried out all its provisions, and complainant furnished the wires, insulators and patents, and extended the said line of telegraph from Rochester to Pittsburg, as provided therein, and continuously maintained offices, as provided in and by said contract; that it furnished telegraphic facilities for the use of said railroad company, as provided by the said contract, and the valuable patent rights owned and controlled by it as aforesaid, and that the said railroad company availed itself of all the rights and privileges secured to it in and by said contract, and used

said telegraph lines in connection with the operation of its said railroad; that in addition thereto, complainant furnished thereafter, continuously, the use of its main batteries for the wires of the railroad company, at all times, day and night, and at many places opened offices for public business, and transmitted by its operators the messages of the railroad company and of its officers, without charge, and thereafter the said railroad company and complainant carried out and observed the provisions of the said contract, and continuously operated the lines of telegraph as provided therein, until the said Cleveland & Pittsburg Railroad Company, as hereinbefore set forth, leased its said line of railroad to the said Pennsylvania Railroad Company, in October, 1871.

In paragraph 7, it is alleged that in the said lease, the Pennsylvania Railroad Company expressly covenanted and agreed with the said Cleveland & Pittsburg Railroad Company to carry out and perform the said contract with the complainant, and did fully perform and observe the same until the transfer by the said Pennsylvania Railroad Company to the defendant, the Pennsylvania Company, of the possession and control of the said line of railroad, by the assignment of said lease, as hereinbefore set forth, in the year 1873; that the defendant, the Pennsylvania Company, in accepting the assignment of said lease, expressly covenanted and agreed with the said Pennsylvania Railroad Company to perform all and singular the covenants, agreements and undertakings of the said Pennsylvania Railroad Company.

In paragraph 8 of said bill of complaint, it is alleged that the defendant, the Pennsylvania Company, after receiving possession and control of the said Cleveland & Pittsburg Railroad, under said assignment of lease in the year 1873, continued thereafter to recognize the rights of complainant and to observe the obligations of said contract, "save and except that by the consent and acquiescence of your orator and the defendant the provisions of the seventh article were modified in that your orator furnished all the material for the repair or reconstruction of said telegraph lines and the defendant furnished the labor therefor."

In paragraph 9, it is alleged that at all times since the making of the said contract, complainant has observed all the obligations and requirements thereof, both as originally written and as modified, as hereinbefore set forth, and has faithfully carried out all the provisions thereof, and expended large sums of money upon the faith of said contract, amounting in the aggregate to many thousands of dollars, and that the said defendant, the Pennsylvania Company, since its possession of the said line of railway, has at all times availed itself of the facilities thus afforded by complainant, without complaint on its part that complainant was in any respect delinquent, in failing to render to said Pennsylvania Company all the service and benefits that it was entitled to receive and enjoy under each and every of the provisions of the said contract.

In paragraph 10 complainant sets forth, that since the assignment of the said lease to the defendant, both complainant and defendant, by mutual consent, have, at their own several cost and expense, strung additional wires upon the said line of telegraph constructed and maintained under the provisions of the said contract, so that at present there are in place upon portions of the said Cleveland & Pittsburg Railroad

a large number of additional wires belonging to complainant and to the defendant railroad company respectively, which wires have been maintained and operated· by complainant and said railroad company under the provisions of said agreement, and their maintenance and reconstruction have been carried on in conformity with the requirements thereof, as modified, to wit, complainant furnishing all the material for the repair and reconstruction of said lines, and defendant furnishing the labor therefor.

In paragraph 11, complainant avers that on or about the 2d day of June, 1902, the defendant caused to be transmitted to complainant a written notice, expressing its desire to terminate the agreement above recited, which said notice is attached to the bill as an exhibit and made a part thereof. Said notice, after referring to the agreements under which the telegraph lines, located upon the right of way of the various railroads controlled by the Pennsylvania Company, are operated by the Western Union Telegraph Company, concludes as follows:

"Whereas said telegraph company furnishes the material and said railway companies the labor for the construction and maintenance of said telegraph lines, thereby establishing a joint ownership in same;

Now therefore, the said Pennsylvania Company hereby gives to said Western Union Telegraph Company notice of its desire to terminate said agreements, and all supplements to or extensions of same—whether written or verbal—and that the same will be terminated on June 2, 1903, and we respectfully request that you select representatives of the telegraph company to meet our representatives at a date, previous to August 1, 1902, that will be mutually satisfactory, for the purpose of adjusting the ownership of your company and this company in the property comprising the telegraph lines referred to.

Will you kindly acknowledge receipt of this letter and oblige,

The Pennsylvania Company,

By James McCrea, Vice President.

To Mr. R. C. Clowry,

President Western Union Telegraph Company,

New York City, New York."

The bill then recites and refers to certain correspondence which ensued upon the reception of the said notice, which is set forth in exhibits attached to the bill and made a part thereof. The result of this correspondence was, in substance, that the said complainant declined to acknowledge the right of the defendant to revoke the said contract, under and pursuant to which the said telegraph lines had been maintained along the line of the railway of the said defendant since 1856, and insisted that the agreement referred to could not be terminated by either party without the consent of the other.

In paragraph 12 are recited certain sections of an act of Congress, approved July 24, 1866, entitled "An act to aid in the construction of telegraph lines and to secure to the government the use of the same for postal, military and other purposes." 22 Stat. 221.

In paragraph 13, complainant avers that it complied with the provisions of the said act of Congress, on or about the 8th day of June, 1867, by filing its written acceptance with the Postmaster General of the United States, of the restrictions and obligations of said act, a copy of which is annexed as an exhibit and made a part of the bill of complaint.

In paragraph 15, complainant avers that in compliance with the act of Congress, approved June 10, 1872, it has transmitted the messages of the government of the United States over lines situated along the railway of the defendant company, and upon its other lines connected therewith, at all times since the passage of said act, at rates far below the usual rates paid by individuals for similar services.

In paragraph 16, complainant recites the act of Congress by which each and every railroad within the limits of the United States is declared a post route.

In paragraph 17, complainant avers "that all the telegraph lines along and upon the said line of railway operated by the defendant, as hereinbefore described, have been constructed thereon with the express consent of the defendant railway, or of its predecessor in title, the Cleveland & Pittsburg Railway Company, with the well-understood purpose that the same should form a part of and be connected with the other lines of telegraph belonging to your orator, and with the knowledge of the said railway company were erected and incorporated in and became part of and were operated as a part of the general system of telegraph lines owned and controlled by your orator."

In paragraphs 18, 19, 20 and 21, complainant sets forth its understanding and contention as to the rights and privileges conferred upon it by the acts of Congress before recited, in reference to the maintaining of its line of telegraph as now existing along the railroad and over the right of way of the defendant.

In paragraph 22 complainant alleges that it stands ready, and is able and willing to perform, and thereby tenders performance of, said agreement to the said defendant company, of the conditions and obligations imposed upon said complainant by said agreement, and is entitled to specifically require from the defendant company the performance on its part of all the provisions of the said contract.

In paragraph 23, complainant says that the said lines constructed and maintained under said contract, constitute some of the main lines of communication for the transmission of telegraphic messages between the city of New York and foreign countries, and the larger cities of the West and Southwest, Mexico and South America, and that the defendant, the Pennsylvania Company, is threatening by its notice of June 2, 1902, and in portions of its correspondence above referred to, to sever the lines of telegraph of complainant, situated upon the said lines of railway, from their connection with the other telegraph lines owned and operated by complainant, and avers that the said defendant, unless restrained by the order of this court, will carry such threats into execution.

In paragraph 24, complainant avers that by carrying such threats into execution, and refusing to perform and observe the provisions of said contract, the defendant will inflict irreparable injury upon complainant and practically destroy the entire value of all the telegraphic property of complainant now constructed, maintained and operated along and upon the right of way of said railways of defendant. It also avers that the said telegraph lines along and upon the said right of way of the railways of said defendant, do not interfere with the ordinary

operation of said railways, and that the continuance of said lines will not be of any detriment to the said defendant.

In paragraph 25, complainant avers that the determination of the defendant to remove the telegraph lines of the complainant, together with the offices and instrumentalities appurtenant thereto, from its said line of railway, and to forbid the further operation thereof, under the provisions of said contract, was not caused by any delinquency of the said complainant in the service furnished by it under the said contract, or by reason of any interference of the said lines of telegraph, or the operation thereof, with the operation of the said railroad, or by any compulsion or necessity to use the space occupied by said telegraph lines, for railroad purposes. As evidence of this, complainant shows, that the said defendant company has entered into, or intends to enter into, a contract with the Postal Telegraph & Cable Company, a rival of said complainant, by the terms of which it undertakes to compel the removal of complainant's lines of telegraph from its premises, and its instruments and fixtures from its stations and buildings, and to install instead thereof the lines, poles, fixtures and instruments of said Postal Telegraph & Cable Company, the said lines of said Postal Telegraph & Cable Company to occupy substantially the same location now occupied by complainant's lines of telegraph, and to be used in the same, or substantially the same manner, to the end that the defendant may transfer and vest in said competing company all the rights and privileges now vested in complainant.

In paragraph 26, complainant avers that the termination of said agreements by the said defendant, as set forth in said notice of June 2, 1902, and the termination of complainant's right to maintain and operate telegraph lines along said line of railway, as contemplated and threatened by the said defendant, is contrary to the stipulations and obligations of the said contract, and is contrary to, and will be destructive of, the rights of complainant, as secured to it under and by virtue of said agreement, and is contrary to the intent and purposes of said act of Congress, and would work irreparable loss and injury to the complainant, to the public, and to the government of the United States.

Complainant then prays:

(1) That defendant may make a true answer, not under oath;

(2) That defendant may be required to specifically perform said agreement, said complainant being ready and willing, and hereby offering specifically, to perform said agreement in all things on its part and behalf;

(3) That the court will order and decree a perpetual injunction against the defendant, the Pennsylvania Company, "restraining it from in any manner violating any of the provisions of said contract on its part, or in any manner interfering with the location, construction, maintenance and operation of your orator's said lines of telegraph, under and in accordance with the provisions of said contract, upon the road or right of way of said defendant";

(4) That complainant's right under the said acts of Congress, to construct, maintain and operate its said line of telegraph, be established;

(5) That a temporary injunction may be issued;

(6) Other and further relief.

As the case made by the allegations of the amended bill must be accepted by the court, the foregoing extended statement of the same is necessary to a clear understanding of the questions raised by the demurrer of the defendant thereto. The demurrer is general and special. The special grounds of the demurrer are, in substance:

(First) That under the terms of the contract, the defendant had the right to revoke the contract, upon reasonable notice; and that the notice given was such a reasonable notice;

(Second) That the relationship existing between the plaintiff and defendant, as shown by the bill, is the joint ownership and operation of a line of telegraph for their joint benefit. That plaintiff and defendant, by said contract and the parol modifications thereof, became partners, and that such partnership was determinable by the notice given by defendant for that purpose, and that as the bill avers full performance by both plaintiff and defendant, of the obligations of said contract, there is no ground for equitable relief;

(Third) That the subject-matter of the contract, as set forth in the bill, is of such a character that a court of equity will not undertake to supervise the specific performance thereof;    .

(Fourth) That the essential provisions of the original contract are illegal and void, in that it was intended thereby to create a monopoly in the telegraph business, and for that reason, the contract is not such as a court of equity will enforce;

(Fifth) That it appears by said bill that said written contract has been in essential particulars modified by parol, and that the relation between the plaintiff and defendant, if not a partnership, is one based upon a parol contract, which is contrary to the statute of frauds, and void.

Defendant further demurs specifically to those portions of the bill which refer to or aver any rights alleged to be vested in plaintiff by reason of the acts of Congress set forth in said bill. The court sustained the demurrer, and entered a decree dismissing the bill.

The grounds of this decree appear, in the opinion of the learned judge of the court below, to be, that the said agreement of October, 1856, did not convey to complainant an easement or grant of real estate in perpetuity, but was an undertaking for the furtherance of a joint enterprise, and was therefore terminable at the option of either party, upon reasonable notice, and the reasoning and argumentation of the opinion is in support of this conclusion. There is an implication in this, that if an easement of support over the lands of the railway company, upon the poles affixed to said lands, was, in effect, granted to complainant, by the contract of 1856, there being no words of limitation therein, the interest of complainant under said contract was in perpetuity. But it does not follow that, if the said contract is not to be interpreted as granting an interest in realty, but as being only an undertaking of a joint enterprise, for the benefit of the parties thereto, it is necessarily revocable at the will of either of the contracting parties.

There is in this case much to support the contention, that the contract of 1856 was, in effect, the granting of an easement in gross, by the railway company to the complainant, and imposed a perpetual servitude, in favor of said complainant, upon the lands of the railway com-

pany. The poles, with their cross-arms, which, by the express terms of the contract of 1856, were to be securely and permanently fixed in the ground by the railway company, along its railroad, and were to be by it maintained and repaired indefinitely, were assuredly part of the real estate of said company. It was upon and over these poles and cross-arms, to be thus indefinitely maintained and renewed by said company, that the telegraph company were given the right, by said contract, to string its wires. There is no express limitation in the contract itself, as to the duration of the rights created by said contract, and it is a recognized doctrine of equity, that no technical words of conveyance are necessary to create the interest intended to be created, if such intent clearly appears by the whole scope and tenor of the writing. Being in writing, there is no ground for objection, that the effect claimed for this agreement is in contravention of the statutes of fraud, of either of the states, whose statutes in that respect would be applicable.

If complainant, under the agreement in question, has a right to claim an easement in the lands owned or possessed by the railroad company, it is conceded that, it is one of perpetual duration, and therefore nonrevocable by the owner of the servient estate. So also regarding the agreement of 1856 as a mere license in writing, to complainant, to occupy the lands owned or possessed by the railroad company, for the purposes of its telegraph line, which, by the erection of said lines and the expenditure of money in other respects, as incident thereto, has become a license executed, and, not being within the denunciation of the statutes of fraud, has ripened into an interest in realty, the same, by reason and authority, must be considered nonrevocable. Le Fevre v. Le Fevre, 4 Serg. & R. 241, 8 Am. Dec. 696; Rerick v. Kern, 14 Serg. & R. 267, 16 Am. Dec. 497; Swartz v. Swartz, 4 Pa. 353, 45 Am. Dec. 697; Huff v. McCauley, 53 Pa. 206, 91 Am. Dec. 203; Thompson v. McElarney, 82 Pa. 174; Pierce v. Cleland, 133 Pa. 189, 19 Atl. 352, 7 L. R. A. 752; Hornback v. C. & Z. R. Co., 20 Ohio St. 81; Wilson v. Chalfant, 15 Ohio, 248, 45 Am. Dec. 574; U. S. v. B. & O. R. R. Co., 1 Hughes, 138, Fed. Cas. No. 14,510; Messicks v. Midland Ry. Co., 128 Ind. 81, 27 N. E. 419; Baker v. C., R. I. & P. Ry., 57 Mo. 265.

It is not necessary, however, in the view here taken of this case, to discuss the question, whether a technical easement, appurtenant or in gross, has been, in effect, granted by the railway company to the complainant, by the provisions of the contract of 1856, nor is it important that we should call the interest of complainant, founded on its contract with the predecessor of defendant, a license executed, or otherwise label the claim set up and founded upon the allegations of the amended bill of complaint.

Accepting the conclusion at which the court below arrived, that no easement or interest in realty, as such, was created in favor of the complainant, we think it still remains to consider whether a correct interpretation of the contract, set forth in the bill of complaint, does not exclude the existence of any power of revocation, at the mere will of either party to the contract. Contractual relations of a permanent character may have been established, in the matter now before us, even though no easement or interest in realty were granted. What these contractual relations are in the present case, and whether they are revocable at the

mere will of either complainant or defendant, are the underlying questions in this case. A proper interpretation of the contract is necessary to their solution.

Referring, then, to the contract as set out in the bill of complaint, we find that its provisions are contained within a narrow scope, and free from complication. The general purpose of the contract is easily arrived at. The telegraph company was extending its lines from the East to the West, and was naturally desirous, for that purpose, of obtaining a right of way, as direct as possible, one that would be protected, and form a link between its lines, east and west of the said Cleveland & Pittsburg Railway. The line of an established railway, like the Cleveland & Pittsburg Railway, would accomplish both these objects. It ran in the right direction, and its occupation and use for railway purposes afforded a protection not otherwise to be obtained, without great expenditure of capital. Moreover, the use of the right of way by the telegraph company created no possible interference with the operation of the railway. On the other hand, a telegraphic service was obviously necessary to the successful management of the railway. It needs no argument to show that this telegraphic service could be more economically obtained by an arrangement with a telegraph company that needed a right of way along its line, which could be maintained and used without any detriment to railroad operations, than by the expenditure of capital necessary to erect and equip, for its own use, a line of telegraph. So the railroad company agreed to fix and maintain a line of poles along its roadway, to be used by the telegraph company for stringing its wires, and the telegraph company agreed to furnish wire, insulators, instruments, patents, and everything except the posts and poles and cross-arms, and to complete said line with one wire and extend it upon the poles then up, or upon poles, equally as good, along the Ohio & Pennsylvania Railroad from Rochester to Pittsburg, and put said line in operation as soon after the poles were set as was reasonably practicable, and to open and equip offices at such places on the line as the said railroad company should designate. And the said telegraph company further agreed to send, free of charge, over said line, all messages appertaining to the business of said railroad, including the ordinary family communications of its officers and agents, giving preference to messages of emergency or pertaining to accidents.

These are the general and salient features of the contract made in 1856, between the complainant and the Cleveland & Pittsburg Railway Company, as the same are set forth in the bill of complaint. Other and minor features are, that the railroad company is to pass or convey, free of charge, over its said road, all men or materials used and employed in building and operating said line. Also, that the said railroad company is to have the right at any time to put upon said posts or cross-arms a telegraph wire, and work the same for its exclusive use, and the telegraph company is also to have the right to string another wire, for its own use, upon said posts or poles.

The seventh paragraph of said agreement provides that, "after the telegraph line is completed with one or more wires, the same is to be kept in repair by the said railroad company, and maintained in first rate working order, as far as practicable. But the said telegraph com-

pany is to furnish or pay to the said railway company the cost of the wires and insulators used and necessary in maintaining the wire or wires of the said telegraph company in good working order."

The amended bill of complaint, as hereinbefore recited, in its eighth paragraph, states a modification of this written contract, which is, that after the assignment of the lease of the Pennsylvania Railroad Company to the defendant, in February, 1873, by the consent and acquiescence of complainant and defendant, the provisions of the seventh article were modified, in that, complainant furnished all the materials for the repair or reconstruction of the said telegraph lines, and the defendant furnished the labor therefor. This modification is not a great or radical one, and amounts to only this, that the telegraph company, instead of paying to the railroad company the cost of material necessary to 'the maintenance of the line, was to furnish the materials themselves, the railway company furnishing the labor, as theretofore. It is not to be overlooked in this connection, that some of the essential averments of the amended bill cover any supposed enlargement of the scope of the original contract, by the parol agreements of complainant and defendant, therein stated. In paragraph 10 of the amended bill, it was averred, that subsequent to the assignment of the said lease of the Cleveland & Pittsburg Railroad to the defendant, the Pennsylvania Company, by mutual agreements between complainant and defendant, additional wires for the special use, and at the cost and expense, of the parties respectively, had been strung upon said line of telegraph "constructed and maintained under the provisions of the said contract," and that the additional wires belonging to the defendant railroad company, have been maintained and operated by complainant and the said railroad company "under the provisions of said agreement, and that the maintenance and reconstruction of said lines have fallen under the provisions of said contract, as modified as hereinbefore set forth." It is significant that, by the averments of paragraph 8 and paragraph 10, "reconstruction" was included within the obligation for maintenance and repair, by mutual understanding between complainant and defendant.

In the seventeenth paragraph of the amended bill, complainant avers as follows:

"Your orator further says that all the telegraph lines along and upon the said line of railway operated by the defendant, as hereinbefore described, have been constructed thereon with the express consent of the defendant railway company or of its predecessor in title, the Cleveland & Pittsburg Railroad Company, with the well understood purpose that the same should form a part of and be connected with the other lines of telegraph belonging to your orator, and with the knowledge of the said railway company, were erected and incorporated in and became part of and were operated as a part of the general system of telegraph lines owned and controlled by your orator; that the said lines of telegraph have been at all times operated and maintained, not only as connected with all the lines of telegraph along and upon the said railroad owned and operated and controlled by the defendant company, but also as an integral part of the general system of telegraph lines owned, controlled and operated by your orator within the United States and Dominion of Canada, and the other lines of telegraph connected therewith, as hereinbefore more fully set forth."

In the view taken by the court below, that no interest in realty was granted by the agreement of 1856, and that the contract between

the parties was merely for a joint enterprise, which, so far as it concerned property, concerned personal and not real property, there is no reason why the contract, with its modifications, as stated in the bill, and which have been in part performed, should not be recognized in a court of equity, as the foundation for a suit for specific performance, or for injunction.  Leake on Contracts, 306.

Such being the nature of the contract, and the circumstances surrounding it, as stated by the amended bill of complaint, we come to the question, is it in the power of either party, without the consent of the other, to terminate said contract, and free itself from all obligation under it?  We think it will sufficiently appear, from a careful consideration of the contract, with its modifications, as set forth in the bill, the circumstances attending its origin, the purposes had in view, and the conduct of the parties throughout the long period during which those purposes seem to have been accomplished, that there was no intention entertained by the parties to the contract, to limit its duration, or confer upon either party, without the consent of the other, the right of revocation.  If a contract is not revocable at the will of either party, or otherwise limited as to its duration, by its express terms, or by the inherent nature of the contract itself, with reference to its subject-matter or its parties, it is presumably intended to be permanent and perpetual in the obligation it imposes.  That the life of a contract should depend on the mere will of either party thereto, without the consent of the other, is a limitation so important and drastic, that it is hard to conceive why, if the parties intended it, they should not express that intention in the contract itself.

The contractual relations established between complainant and defendant, as we gather them from the averments of the amended bill, (which, for the purposes of this demurrer, must be taken as making the case before us), involve mutual covenants, which are mutual considerations.  It is true, that some of these are executory in their character, but many most important stipulations have been executed by the complainant.  The installment of the telegraph line and plant, by complainant, was an initial and executed consideration, involving not only a large expenditure of money, but the orderly and successful establishment of its system east and west of the lines of the defendant, and has had an important influence on the situation of the parties.  The scope and purposes of the contract were, we think, within the powers of both corporations.  It has been an important, useful and economical means of advancing the public ends, for which both were created.  That the railroad company has found it to be most convenient and economical to make such an arrangement with an established telegraph company, rather than to incur the expense of building and equipping telegraph lines for itself, is evidenced, as we have already said, by the statement in the bill, that a rival telegraph company is to be installed in its place, to perform the same service, and in the same manner, as is now performed by the complainant under its contract.  The essential nature of the service is such as to indicate that permanency in contractual relation was intended by the contract under which these parties have lived for nearly half a century.  We certainly find nothing in the character of the relation established between these parties so long ago, as would indi-

cate that it was terminable at the will of either party, without the consent of the other. If a power of revocation was intended by the parties to this contract, it would seem the natural and logical course, that such power should have been expressly incorporated in the contract itself. Apart from those contracts, which, from their inherent nature, imply a power of revocation, it would seem that the intention of parties to an agreement, that it should be perpetual and without limit as to duration, could not be more properly expressed than by silence as to any time limit, or power of revocation. Reason and authority would seem to concur in support of this doctrine, and we find no direct and controlling authority to controvert it. The reasoning of the court below has apparently been on a contrary presumption, that is, that every written contract, vesting no interest in realty, and silent as to the time or method of its duration, is to be presumed revocable at the will of either party, upon reasonable notice.

The case of Great Northern Ry. Co. v. Manchester, Sheffield, etc., Ry. Co., 5 De Gex & Smale's Chan. Rep. 138, is interesting upon this point. The opinion delivered by Vice Chancellor Parker, is interesting, and its reasoning is not inapplicable to the case before us. The syllabus of the case, which correctly summarizes the points decided, is as follows:

"Two directors of a railway company (the plaintiffs) met two directors of another railway company (the defendants), and entered into an agreement in writing, signed by all four directors on behalf of their respective companies, whereby it was mutually agreed that each of the companies should, interchangeably, use the railway of the other company, on certain specified terms. The agreement contained no words of succession or of restriction: Held, that these contracts were not mere licenses determinable at will, but conferred rights of a permanent nature on the companies. Held, also, that the terms of the contract were not too vague, but that the user conceded was one consistent with the proper enjoyment of the railway, the subject matter of the contract, and within the rights of the granting party. Held, also, that this court will grant an injunction restraining the defendants from acting contrary to a negative agreement, although it cannot specifically enforce the performance of the whole of the agreement."

The Vice Chancellor, in describing the right conferred by the contract, upon the complainant, uses this language:

"If, for valuable consideration, a party says that another shall have the right of using a thing, a right in the nature of an easement, I think that, prima facie, the inference to be drawn from that language, would be that it was not a mere license, determinable at the will of the party who had granted it."

The case of Llanelly Ry. & Dock Co. v. London & N. W. Ry. Co., L. R. 7 H. L. 550, is instructive on this point. The judgment of the House of Lords was unanimous, and affirmed the unanimous decision of the Lord Justices of Chancery Appeal. L. R. 8 Ch. App. 942. The facts of the case are, briefly, as follows: The Llanelly Company being in want of money to complete an extension line, applied to the N. W. Railway Company for a loan of £40,000, and it was agreed that the N. W. Company should lend the money and have running powers over the lines of the Llanelly Company. An agreement under seal was entered into, not referring to the loan, by which it was agreed, (1) that, subject to such by-laws and regulations of the Llanelly Company as

should from time to time be in force, the N. W. Company might run over and use the railways of the Llanelly Company, and their stations, sidings, and conveniences; (2) that the receipts from through traffic should be apportioned between the two companies according to mileage proportion, with a certain allowance per cent. to the N. W. Company out of the Llanelly Company's share; (3) that the N. W. Company might have their own staff at the stations on the Llanelly Company's lines; (4) that, whether the running powers were exercised or not, there should be a complete system of through booking and through fares from the stations of each company by the lines of the other; (5) that, if the running powers were exercised, the fares should be fixed by the N. W. Company, and if the Llanelly Company objected to any of them, then by arbitration; (6) that the N. W. Company should not carry the local traffic on the Llanelly lines, but should, if required by the Llanelly Company, carry local passengers for 15 per cent. of the local fares; (7) that the companies should send by each other all traffic not otherwise consigned to and from stations on the lines of each other whenever such lines formed the shortest route; (8) that any difference under the agreement should be settled by arbitration under the Railway Companies Arbitration Act 1859. The N. W. Company advanced the £40,000, and the agreement as to running powers was acted upon for some time, but afterwards the Llanelly Company gave three months' notice to determine it.

The opinion of the Court of Chancery Appeals was delivered by Lord Justice James, holding that evidence of the advance of the £40,-000 having been the consideration for the agreement, was admissible, but not on the ground that it was a consideration for the contract, because, apart from this evidence, the agreement was not determinable, and saying:

"In my opinion, the evidence is not material, because, independently of that, it appears to me that there is sufficient consideration expressed in the agreement itself, and that the agreement, on the face of it, without any reference to that evidence, is conclusive upon the parties."

As to the main point in the case, the language of Lord Justice James is as follows:

"The contention on the part of the Llanelly Company, is, that this is an agreement determinable at will, or by reasonable notice. The contention of the London and North Western Railway Company is, that it is, as it is expressed to be, an agreement without any limit whatever in point of time. The case is in many respects similar to the case of the Great Northern Railway Company v. Manchester, Sheffield and Lincolnshire Railway Company (1), in which there were running powers given interchangeably between the railway companies, and the Vice Chancellor held that they were given in perpetuity. In my opinion this case is not distinguishable on any sufficient ground from that case, which was decided as far back as the year 1851, and has been considered to be law from that day to this. As that, however, was only the decision of a Vice Chancellor, and as it has been contended before us that a great part of the ratio decidendi in that case does not apply to this case, it is incumbent upon us to express our own opinions upon the matter as if no such authority existed; and upon general principles I have formed a very decided opinion that I should have arrived at the same conclusion as the Vice Chancellor did in that case; and I should, if the thing were res integra, arrive at a similar conclusion in this case. I start with this proposition, that prima facie every contract is permanent and irrevocable, and that

it lies upon a person who says that it is revocable or determinable to show either some expression in the ·contract itself, or something in the nature of the contract, from which it is reasonably to be implied that it was not intended to be permanent and perpetual, but was to be in some way or other subject to determination. No doubt there are a great many contracts of that kind; a contract of partnership, a contract of master and servant, a contract of principal and agent, a contract of employer and employed in various modes—all these are instances of contracts in which, from the nature of the case, we are obliged to consider that they were intended to be determinable. All the contracts, however, in which this has been held are, as far as I know, contracts which involve more or less of trust and confidence, more or less of delegation of authority, more or less of the necessity of being mutually satisfied with each other's conduct, more or less of personal relations between the parties.

But I am of opinion that no such consideration applies to a case in which there is a grant, or· an agreement in the nature of a grant, of a wayleave, or of running powers, which is only another mode, according to my view of it, of expressing a wayleave. * * *

That would seem to me to be the principle with which we must start in considering whether this agreement, which is in indefinite terms, means that the London and North Western Railway Company shall have power from time to time, and at all times, to run over and use with their engines, carriages, vehicles, and servants the lines of the Llanelly Company and their conveniences, or that they shall have power only during the pleasure of the Llanelly Company. Then, when we come to look into the agreement, it appears to me that almost every line of it is full of permanence and adverse to the notion of its being revocable."

An appeal was taken to the House of Lords, and the judgment and opinion of Lord Justice James were expressly and unanimously affirmed, Lord Chancellor Cairns and Lords Chelmsford, Hatherly and Selbourn delivering concurring opinions.

As the learned judge of the court below, as well as the counsel for appellee, seeks to distinguish this case from the one in hand, by observing that a present and valuable consideration, to wit, the loan of £40,000, had passed to the party that afterwards sought to terminate the contract; it is to be observed, that this so-called "valuable consideration" was a loan, and not a payment of money, for the privileges obtained. The £40,000 was the consideration of the contract of loan, and was advanced on the faith of debenture securities bearing four per cent. interest. But it is sufficient to call attention here to the fact, that Lord Justice James, in the Court of Chancery Appeal, expressly disclaims the admissibility of the contract of loan, as evidence of consideration for the principal contract then before the court, and distinctly says, as already quoted:

"In my opinion, the evidence is not material, because, independently of that, it appears to me that there is sufficient consideration expressed in the agreement itself, and that the agreement, on the face of it, without any reference to that evidence, is conclusive upon the parties."

So also, in the House of Lords, Lord Chancellor Cairns, in delivering the principal opinion, says, speaking of the contract:

"The later sections, and especially that seventh section, appear to me clearly to carry a consideration which would be amply sufficient, as a matter of consideration, to support this agreement upon the face of it, and without reference to the loan to which I have already referred."

But whether the loan of £40,000 was an essential part of the consideration, or not, the ground upon which the nondeterminability of such

a contract at the will of one of the parties, is placed, is that there had been an executed consideration, which had altered the situation of the parties, to the loss of the one against whom the contract was sought to be determined, and not the mere fact that there was a paid up money consideration. In other words, the essential requirement is a real and valuable consideration, executed in whole or in part, and not a particular kind of consideration. In the case of the Great Northern Ry. Co. v. Manchester, Sheffield, etc., Ry. Co., above referred to, there was no consideration beyond the part performance of the mutual covenants of the contract.

Learned counsel for appellee contend that the relationship established between the parties under this contract, was really a partnership, and therefore comes within the rule applicable to partnership contracts containing no time limit, and so is revocable at the will of either party. We do not think this contention a sound one. The contractual relation between complainant and defendant did not embrace the elements of a partnership. The several contributions of the parties to what, if you please, was a joint enterprise, was each for its own benefit, and did not, and was not intended to, result in the product of a common fund, to be shared as profits. Nor was there the incident of joint and individual liability for the debts incurred in the business by one of the parties without the consent of the other, growing out of the implied agency of each partner to act for the others, which is commonly characteristic of a partnership. The language of the Lord Chancellor, in his opinion, is pertinent to this contention of the counsel for the appellee. It is as follows:

"My Lords, reference was made to the well-known cases of contracts of hiring service and contracts of partnership. These cases appear to me to have no analogy whatever to the present. With regard to contracts of hiring and service the law is well settled as applied to different kinds of hiring and service, assigning to each of them certain notices by which they can be terminated; and they are, besides, engagements which depend upon the personal confidence which one of the parties reposes in the other, and which in their nature cannot be supposed to be of a personal character. With regard to contracts of partnership, they also are already ruled and settled, by law, to be capable of termination at any moment unless a definite limit is prescribed upon the face of them. And, the law being well settled, when you have a contract of that kind, you apply the understood law, and you hold that the parties, knowing what the law was, must be supposed to have intended to enter into a partnership which could at any time be terminated, if they did not provide upon the face of their contract that it should be a continuing partnership. But your Lordships have to decide here without any rule of law already laid down, with regard to agreements of this kind, upon the nature of the agreement itself, and upon the construction of that agreement as we find it expressed; and, applying the considerations which I have pointed out to your Lordships, I should humbly suggest to you, that those considerations clearly lead to the conclusion that an agreement of the kind which I have read, entered into under the circumstances which I have mentioned, must, in its nature, be an agreement which should have a continuing operation, unless some power is given on the face of it to the parties to terminate the agreement."

If the agreement in the case now before us were one terminable at the will of either party, without the consent of the other, then it could have been revoked by the railroad company as soon as the line had been established and the offices equipped by the complainant. We do not

believe that such a power can be fairly inferred from the nature of the contract, the circumstances that attended the making of it, or the situation of the parties.

The judgment of the Supreme Court of the United States, in the case of Franklin Tel. Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776, seems fully to support the position here taken. In that case, the telegraph company had given to Harrison the right to put up, at his own expense, and maintain and use a wire upon the poles of the company, between New York and Philadelphia, the company to have the use of the wire when not so employed. The company agreed to keep and maintain the wire, and to bear all expenses connected with its working, and to permit such use by Harrison for a period of ten years. At the end of that time, the wire was to be the property of the company, the company agreeing to lease the same to Harrison for his own use, for the sum of $600 per annum, payable quarterly, and upon the same terms, in all other respects, as if the wire had not been given up to the company. The wire was put up by Harrison, and used by him for a term of 10 years, without compensation, and after that, at the agreed compensation. The company then notified Harrison, that the use of the wire by him had become such as to exclude the company from all use of it, which was not contemplated by the original contract, and that the agreement would be terminated by the company. The bill was filed by Harrison, to restrain the company from so doing. It had been contended in the circuit court, as it was contended in the Supreme Court, that the agreement to lease the line, at the expiration of 10 years, to Harrison, for a yearly rent of $600, was revocable, because, no term being mentioned, the use of the word "lease" imported a contract revocable from year to year. The decree of the Circuit Court, which was held by Mr. Justice Bradley and Judge Butler, ordered and adjudged that Harrison was entitled, so long as the defendant, the Franklin Telegraph Company, their successors or assigns, should keep up and maintain the line of telegraph between the cities of New York and Philadelphia, mentioned in said agreement, or any telegraph line between said cities, to an irrevocable license, subject to the payment of $600 per annum, payable quarterly, etc. This decree was affirmed by the Supreme Court, and the right of the complainant to a decree for specific performance, fully sustained.

The case of Texas, etc., Ry. Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385, much relied upon by appellee, and cited by the learned judge of the court below as a leading authority in support of his conclusions, originated in a suit brought by the city of Marshall, Tex., to enforce specific performance of a contract of the railway company, to "permanently establish its eastern terminus and Texas office at the city of Marshall, and also to establish and construct at said city the main machine shops and carworks of said railway company." In consideration of this engagement on the part of the railroad company, the city of Marshall conveyed to the said company, a lot of ground suitable for said buildings, containing about 66 acres, and in addition, donated to said company county bonds to a large amount. The case went on to final hearing, upon bill, answer, exhibits and testimony on both sides. It appeared that, pursuant to the contract, the railway com-

pany did establish its eastern terminus and Texas office at the said city of Marshall, and did locate and construct there its main machine shops and carworks, and so maintained them during a period of eight years. At the end of that period, the railroad company removed its office and shops to other cities at a considerable distance from the city of Marshall. The railway company introduced evidence tending to show that the exigencies of its business required the change thus made, and that it would have been hindered and disabled in the performance of its public service, by longer maintaining its office and shops within the limits of the said city. Mr. Justice Miller, in delivering the opinion of the Supreme Court, maintaining the right of the railway company to make the said change, does not place that right upon the ground that the said contract was one determinable or revocable at the mere will of the railway company, but upon the ground that it had been fully executed and performed by said company, by the original location of the said office and shops, and their maintenance at the said city during a period of eight years, as will clearly appear from the opinion of the court. The ratio decidendi sufficiently appears in the following extracts from the opinion :

"The object of the city might very well be supposed to have been attained by the selection of the city as a terminus of the railroad, the construction and establishment there of its offices, its depot, its car manufactory and other machinery, since there was hardly any ground to suppose that the railroad company would ever have inducements enough to justify it in removing a.l these things to another place. * * * It appears to us, so far from this, that the contract on the part of the railroad company is satisfied and performed when it establishes and keeps a depot, and sets in operation car works and machine shops, and keeps them going for eight years, and until the interests of the railroad company and the public demand the removal of some or all of those subjects of the contract to some other place. This was the establishment at that point of the things contracted for in the agreement. It was the fair meaning of the words 'permanent establishment,' as there was no intention at the time of removing or abandoning them. The word 'permanent' does not mean forever, or lasting forever, or existing forever. The language used is to be considered according to its nature and its relation to the subject matter of the contract, and we think that these things were permanently established by the railway company at Marshall."

There is here no discussion of the right of the railway company to terminate an existing contract, but a decision by the court that the contract in question must be considered as having been sufficiently performed by the railroad company, by the location and maintenance of its office and shops, with no present purpose otherwise than permanently to maintain them. It is clear that the grounds of this decision differ materially from those upon which the present case must be determined.

On the whole, we are of opinion that the relations created between the parties by the agreement in question, were not merely personal, as in cases of partnership, agency, master and servant, and the like, but that rights in property and the user thereof, rights in the nature of an easement, were conferred upon the appellant, and that no right in the appellee to revoke or determine the same, in the absence of express stipulation to that effect, is to be inferred from the silence of the contract in that respect, or from its terms, purpose, or inherent nature.

This brings us to the other main contention of the appellee, to wit, that this is not such a contract as will be enforced specifically, because,

as alleged, first, the contract was intended to create a monopoly, and is therefore illegal and void. In support of this contention, the appellee refers to the eighth paragraph of the agreement of 1856, which is as follows:

"8th. The said Railroad Company is not to allow any other telegraph company or individual to build or operate a line of telegraph on or along its said railroad, or any part thereof."

This stipulation of the contract was undoubtedly valid, when made. But it is contended, that the act of Congress, entitled "An act to aid in the construction of telegraph lines," etc., passed 10 years thereafter, struck the stipulation with nullity, by providing that any telegraph company, then or thereafter organized under the laws of any state, which shall have accepted the provisions of the act, shall have the right to construct, maintain and operate lines of telegraph over and along any of the military or post routes of the United States, which have been or may hereafter be declared such by act of Congress. Undoubtedly, the act of Congress renders nugatory the restraint imposed upon the railroad company by the 8th paragraph of the contract referred to. It does not follow, however, as contended by appellee, that the invalidity of this eighth paragraph, after 1866, strikes also with invalidity the other provisions of the contract made 10 years prior to the passage of the act referred to. It does not constitute the main consideration of the contract. It has never, during the long period of the existence of this contract, been sought to be enforced, nor is it sought to be enforced now. Neither the Postal Telegraph Company, nor any other telegraph company has been made a party to this suit. No prayer in the bill asks for any relief against any other telegraph company, or that any other telegraph company should be prevented from constructing, maintaining or operating lines of telegraph over or along the railroad of the defendant. All it asks, is that it, the Western Union Telegraph Company, shall not be disturbed in the possession of its right of way over and along said railroad, and in the possession of its offices and equipment, as secured to it by contract.

It is perfectly well settled, that where one provision in a contract, which does not constitute its main or essential feature or purpose, is void for illegality, or otherwise, but is clearly separable and severable from the other parts which are relied upon, such other parts are not affected by the invalid provision, and may be enforced as if no such provision had been incorporated in the contract. The case of the U. S. v. The Union Pacific Railway Co., supra, relied upon by counsel for appellee to support the contention, that the whole contract between plaintiff and defendant is invalid, by reason of paragraph 8 thereof being in contravention of the act of Congress, is not inconsistent with the views just enunciated. The suit in that case proceeded on the ground that the Union Pacific Railway Company was conducting its business under certain contracts and agreements with the Western Union Telegraph Company, that were not only repugnant to the provisions of the act of Congress, of 1888, but were inconsistent with the rights of the United States. The relief given was a decree, annulling these contracts and agreements and compelling the railway company to maintain and operate telegraph lines on its roadways, as required by the act. The

first section thereof provides, that all railroad companies to which the United States have granted any subsidy, etc., and which, by the acts incorporating them, were required to construct, maintain, or operate telegraph lines, "shall forthwith and henceforward, by and through their own respective officers and employés, maintain and operate, for railroad, governmental, commercial and all other purposes, telegraph lines, and execute by themselves alone all the telegraph franchises conferred upon them and obligations assumed by them under the acts making the grants, as aforesaid."    The case is a long one, and the facts complicated.    In regard to the contract of July 1, 1881, between defendant and the Western Union Telegraph Company, Mr. Justice Harlan, delivering the opinion of the court, uses this language:

"But that agreement is illegal, not simply to the extent that it assumes to give to the Western Union Telegraph Company exclusive rights and advantages in respect of the use of the way of the railroad company for telegraph business; but it is also illegal, because, in effect, it transfers to the Western Union Telegraph Company a telegraphic franchise granted it by the government of the United States. The duty to maintain and operate a telegraph line between the points specified in the Act of 1862 was committed by Congress to certain corporations which it named, and neither they, nor any corporation into which they were merged, could, without the consent of Congress, invest a state corporation with exclusive telegraphic privileges on the line of the roads it then owned or thereafter acquired. The United States was not bound to look to the Western Union Telegraph Company for the discharge of the duties, the performance of which, in consideration of the aid received from the Government, the Union Pacific Railroad Company, and other named companies, undertook to discharge, for the benefit of the United States and of the public. No agreement with the telegraph company, to which the assent of the government was not given, could take from the railroad company its right at any time, to itself maintain and operate the telegraph line required by the act of 1862 for the use of the government and of the public, nor impair the power of Congress to require the performance ·by the railroad company itself of the duties imposed by that act."

We have quoted at length this passage from the opinion of the court in this case, because it is thereby abundantly apparent why the court held that those illegal provisions of the contract were its very meat and essence—the essential part of the agreement, and therefore struck the whole contract with invalidity.

As another reason why this contract will not be enforced specifically, it is alleged that it calls for continuing contributions of money and property, and exercise of judgment and skill, and no decree that could be entered by the court would be final. This contention is much insisted upon, and requires careful consideration. A prayer for a specific performance always appeals largely to the discretion of the court whose jurisdiction is invoked. In the exercise of this discretion, courts have, it is true, in many cases declined to enforce a contract, whose provisions are multifarious, and whose obligations are continuing, so that a final decree cannot be made, which will end the matter, but will require constant supervision and supplemental proceedings to enforce the performance of constantly recurring duties. Each case, however, must depend upon its own circumstances.

The case of Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955, cited by appellee in support of its contention, illustrates very well the principle upon which courts will exercise their discretion in refusing a decree

for specific performance. That was a case where one owner of a quarry conveyed the quarry lands to his co-owners, reserving a right in the grantor to enter and keep possession, and take the marble himself, if grantees did not furnish marble of a certain kind and under certain conditions named in the contract. The court said, that the specific performance of a contract will not be decreed, where the duties to be fulfilled by the grantee are continuous, and involve the exercise of skill, personal labor, and cultivated judgment, as e. g., to deliver marble of certain kinds and in blocks of a kind that the court is incapable of determining whether they accord with the contract, or no. There were other reasons given by the court for refusing a decree for specific performance, such as a want of mutuality in the contract, and that there existed a complete remedy at law. But the reason first given, that the duties to be specifically performed were not only continuous but involved the exercise of skill, personal labor and cultivated judgment, sufficiently indicate the line of demarcation between such continuous duties as can be, and such as cannot be, the subject of a decree for a specific performance. The use of individual skill, the performance of personal labor, or the exercise of a cultivated judgment, are matters clearly beyond the reach of a judicial decree, and cannot be efficiently compelled by a mandatory process.

So also, the case of Port Clinton R. R. Co. v. Cleveland & Toledo Ry. Co., 13 Ohio St. 544, which was, as stated by appellee, an action for specific performance of a contract to operate a railway. We can well understand, upon the principle laid down in the case of Marble Co. v. Ripley, why the decree was refused in this case.

The case of Texas & Pacific Ry. Co. v. Marshall, supra, is much relied upon as to this point also. This, as we have seen, was an action to compel the Texas & Pacific Railway Company to maintain its offices and shops in the city of Marshall, under a contract to that effect. Mr. Justice Miller, having already decided that the contract did not require a perpetual maintenance of the shops and offices in the town of Marshall, and that it had been substantially performed by the railway company, proceeds to decide that, even if the contract were to be otherwise construed, it is not one to be enforced in equity, and, founding his opinion upon the decision of Marble Co. v. Ripley, says:

"If the court had rendered a decree, restoring all the offices and machinery and appurtenances of the road, which have been removed from Marshall to other places, it must necessarily superintend the execution of this decree. It must be making constant inquiry as to whether every one of the subjects of the contract which have been removed has been restored. It must consider whether this has been done perfectly and in good faith, or only in an evasive manner. It must be liable to perpetual calls in the future for like enforcement of the contract, and it assumes, in this way, an endless duty, inappropriate to the functions of the court, which is as ill calculated to do this as it is to supervise and enforce a contract for building a house or building a railroad, both of which have in this country been declared to be outside of its proper functions, and not within its powers of specific performance."

So also, it has been held in the cases cited by the appellee, that a contract to build a railroad will not be specifically enforced in equity, because there cannot be one decree made which would end the matter, but

that it would necessarily require various supplemental proceedings. We do not see that any of the cases cited in behalf of this contention by the appellee, are applicable to the case in hand. The specific performance which is sought here, is that the defendant should observe the contract under which both parties have lived for nearly half a century, by not interfering with complainant's rights under said contract, and by not compelling complainant to remove its wires and dismantle its offices along the line of defendant's road. It thus appears that specific performance, in the proper sense of those terms, is not the main relief sought by the bill. The prayer which, if granted, will be operative and efficient to give to complainant the remedy it demands and requires in this case, is the injunctive process of the court. It asks that the defendant company may be enjoined from interfering with the location, construction, maintenance and operation of complainant's said lines of telegraph, under and in accordance with the provisions of said contract, upon the roadway or right of way of the said defendant. So that, when the court has determined that the contractual relations which have existed so long between the parties, are not determinable merely at the will of the defendant, it means nothing more than that those relations shall continue as they have heretofore existed. Such a determination does not involve any change in the present situation. Nothing is required to be done by either complainant or defendant, other than they have been doing for nearly half a century, and are still continuing to do. It does not require, as in the case of Texas & Pacific Ry. v. Marshall, that extensive workshops and office buildings should be moved from one location to another and distant one. It does not require the defendant to build or operate a railroad, or even to build or operate a telegraph line. All that is required, is that the status quo should be preserved, and the complainant not interfered with. Injunctive relief is the principal, if not the only, relief required. If, however, after a decree giving such relief, difficulties should develop in the relations heretofore existing under the contract, such difficulties may be dealt with as they arise. We are not to assume that the mandate of the court will not be respected and obeyed, or that there will be any real difficulty in simply maintaining the old-time and existing relations between complainant and defendant.

A number of cases have been cited by the appellant, which maintain to the fullest extent the views we have here expressed. Without intending to discuss them at length, we will refer briefly to the case of Joy v. St. Louis (C. C.) 29 Fed. 546. A railroad company claimed, under certain contracts, a right to the use of the terminal facilities of another railroad company, for the use of its trains. The provisions of the contract were many and complicated. A bill was filed for specific performance. The case was tried before Judge Brewer, then Circuit Judge, who entered a decree in accordance with the prayer of the bill. In the course of his opinion, he says:

"I see no satisfactory reason why courts may not also hold sufficient and valid a mere contract for the right, and, determining the right, also settle and prescribe the terms of the use. It is true, that such a decree cannot be executed by the performance of a single act. It is continuous in its operation. It requires the constant exercise of judgment and skill by the officers of the corporation defendant; and, therefore, in a qualified sense, it may be

true that the case never is ended, but remains a permanent case in the court, performance of whose decrees may be the subject of repeated inquiry by proceedings in the nature of contempt. * * * So, when a decree passes in a case of this kind, it remains as a permanent determination of the respective rights of the parties, subject only to the further right of either party to apply for a modification upon any changed condition of affairs."

An appeal was taken to the Supreme Court of the United States, and the decree of the Circuit Court was unanimously affirmed. In delivering the opinion of the Supreme Court, Mr. Justice Blatchford says:

"In the present case, it is urged that the court will be called upon to determine, from time to time, what are reasonable regulations to be made by the Wabash Company for the running of trains upon its tracks by the Colorado Company. But this is no more than a court of equity is called upon to do, whenever it takes charge of the running of a railroad by means of a receiver. Irrespective of this, the decree is complete in itself and disposes of the controversy; and it is not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances."

See, also, Chicago, R. I. & Pac. Ry. Co. v. Union Pac. Ry. Co. (C. C.) 47 Fed. 15; Franklin Tel. Co. v. Harrison, supra; Wolverhampton & Walsall Ry. Co. v. London & N. W. Ry. Co., L. R. 16 Eq. Cas. 343; Greene v. West Cheshire Ry. Co., L. R. 13 Eq. Cas. 44; P. P. & C. I. R. R. Co. v. C. I. & B. R. R. Co., 144 N. Y. 152, 39 N. E. 17, 26 L. R. A. 610.

It must be borne in mind, that the demurrer brings before us only the case as made by the allegations of the bill. These set out the written contract, its parol modifications, the circumstances attending the making thereof, the situation of the parties, and the full performance on both sides of its covenants and stipulations during a period of nearly 50 years. There is no suggestion as to any changed conditions, imposing hardship upon the defendant in the continuance of those contractual relations, or of a situation which would make it intolerable for the railroad company to continue the contract. Neither in the notice of June 2, 1902, expressing the desire and intention of the railroad company to terminate the contract, nor in the correspondence between the parties, which ensued thereafter, was there any reason given by the railroad company for its action in the premises. It simply asserted its right under the contract to terminate it at will. The averment, that at different times, by the consent and acquiescence of both parties, the scope of the contract was enlarged, and modifications of its terms agreed to, affords ground for the inference of a renewed and continuing satisfaction on the part of the defendant with the established contractual relations. It was open to defendant, if it were dissatisfied with the contract, to refuse modification or change therein, and thus possibly have compelled an abandonment of the same by the telegraph company. All such matters, however, are at this stage of the case matters of conjecture. We must now decide the equities of the case upon the allegations of the amended bill.

We do not think that the act of Congress, of July 24, 1866 (14 Stat. 221), has any bearing on the situation in which the complainant finds itself, but, in view of the opinion hereinbefore expressed, it is unnecessary to discuss the contention of complainant in this behalf.

For the reasons hereinbefore given, the decree of the Circuit Court is hereby reversed, and the cause is remanded to that court for further proceedings in accordance with this opinion.